**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GRADY ARNOLD,
                *Petitioner-Appellant,*

v.

D.L. RUNNELS,
                *Respondent-Appellee.*

No. 04-15194

D.C. No.
CV-01-20810-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
January 13, 2005—San Francisco, California

Filed August 24, 2005

Before: Myron H. Bright,* A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Bright;
Dissent by Judge Callahan

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

11385

## COUNSEL

Amitai Schwartz, Esq., Elizabeth Letcher, Esq., Emeryville, California, for the appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Peggy S. Ruffra, Supervising Deputy Attorney General, Morris Beatus, Deputy Attorney General, San Francisco, California, for the appellee.

## OPINION

BRIGHT, Circuit Judge:

Grady Arnold, at age thirty-six, was sentenced by a California state court to serve a forty-one-year to life imprisonment sentence as a third-strike offender, upon being convicted of attempted armed robbery, possession of a firearm by a convicted felon, and shooting at an occupied building in violation of the California Penal Code. His conviction was affirmed by the state court of appeal. Following denial of review by the Supreme Court of California, Arnold sought relief on several grounds *pro se* through a writ of habeas corpus from the federal district court, under 28 U.S.C. § 2254. The court denied the writ.[1]

We granted a certificate of appealability as to the sole question of whether the trial court violated Arnold's Fifth Amendment rights by admitting a tape recording of certain utterances Arnold made during an interrogation, even though Arnold had said he did not want to talk on tape and responded to all substantive questions on tape by saying "no comment."

Two critical facts control the outcome of this case: Arnold unequivocally invoked his right not to speak on tape by saying he did not want to talk on tape; further, he never thereafter waived that right. Nonetheless, the interrogator turned the tape recorder on and induced Arnold to respond to questions. The trial court allowed Arnold's "no comment" utterances to be used against him. The *Miranda*[2] rule requires a remand for

---

[1]Arnold was tried in the Superior Court of the State of California in and for the County of Alameda. His direct appeal was heard by the Court of Appeal of the State of California, First Appellate District, Division Two. His petition for habeas corpus was heard by the United States District Court for the Northern District of California. Arnold is represented by counsel in this appeal. He was also represented by (different) counsel in the California Court of Appeal.

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

a new trial. Thus, we reverse the decision of the district court and direct the issuance of the writ of habeas corpus.

## I.

We review de novo the district court's decision to grant or deny a habeas petition under 28 U.S.C. § 2254. *Leavitt v. Arave*, 371 F.3d 663, 668 (9th Cir. 2004). Under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d), a petitioner must demonstrate that the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law under United States Supreme Court precedent, or that the decision was based on an unreasonable determination of the facts. *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003); *Ramirez v. Castro*, 365 F.3d 755, 762 (9th Cir. 2004). State court findings of fact are presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence. *Davis v. Woodford*, 333 F.3d 982, 991 (9th Cir. 2003).

If the state courts thus unreasonably applied the law or determined the facts, we must consider whether the error was harmless, under the *Kotteakos*[3] harmless error standard. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

## II.

Arnold argues that the state trial court violated his Fifth Amendment rights by admitting into evidence a tape recording of a portion of an interrogation. Police officers suspected Arnold of participating in an attempted armed robbery that occurred in September 1995. In July 1996 two officers interrogated Arnold, who was in prison on an unrelated matter.

At the beginning of the interrogation, the primary interrogator advised Arnold of his rights under *Miranda*. Arnold

---

[3]*Kotteakos v. United States*, 328 U.S. 750 (1946).

orally waived those rights and filled out and signed a "waiver card." That portion of the interrogation was not tape recorded.

Approximately thirty minutes into the interrogation, the primary interrogator indicated that he was going to tape record part of the interrogation. Arnold said that he did not want to talk on tape. Disregarding Arnold's unequivocal statement, the interrogator turned the tape recorder on and began asking Arnold questions. After some prefatory remarks, the interrogator recited the facts of Arnold's oral and written *Miranda* waiver at the beginning of the interrogation and asked Arnold if the recitation was correct. Arnold answered, "yeah." The interrogator then asked a series of substantive questions, to each of which Arnold replied, "No comment."

Notably, the interrogator did not ask Arnold if he was waiving his right to refuse to speak on tape, and Arnold did not waive that right. There was no talk of *Miranda* rights beyond the statement of historical fact that Arnold had signed the waiver card half an hour earlier.

These facts of the interrogation are clear — and uncontradicted — from two sources in the record: the testimony of the interrogating officer and the transcript of the tape recording.[4] The officer testified about the tape recording as follows:

> Q. At some point you actually did something with the tape recorder which would indicate that you were getting ready to start recording?
>
> A. Yes.
>
> Q. And when you did that, did Mr. Arnold have any particular reaction?

---

[4]We hereby grant Arnold's unopposed motion to augment the record to include a transcript of the taped portion of the interrogation.

A.   He said he didn't want to talk on-tape.

. . . .

Q.   Now, notwithstanding the fact that Mr. Arnold told you he did not want to talk on-tape, did you go ahead and activate the tape anyhow?

A.   Yes.

Q.   When you activated the tape, did you go over again the admonishment and waiver of rights?

A.   Yes.

Q.   Did Mr. Arnold acknowledge on-tape that he had agreed to waive his rights and talk to you?

A.   Yes.

The transcript of the tape recording reads as follows:

4321 Testing. Testing. Yeah, today is, uh, July 12, 1996. It's about twelve noon. I'm Sergeant Joseph Aguirre of the Oakland Police Department Robbery Unit presently in Susanville State Prison. Present also is my partner, Sergeant Earl Sherman, and the subject of the interview is Mr. Grady Arnold.

Grady, would you state your name and birth date for the tape?

A:   Grady Arnold, [unintelligible] eleven [unintelligible].

Q:   And, Grady, prior to turning the tape on, I filled out the statement form with your name and address and so forth, and, I advised you of your

rights. I advised you that you have the right to remain silent, anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have one present while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you for any questioning if you wish and I asked you if you understand each of these rights I've explained to you and you said, "yeah." I said, having these rights in mind, do you wish to talk to us now and you said, "yeah." I wrote your responses here next to the questions and I had you place your initials on the statement form. Do you recall doing that?

A: Yeah.

Q: Okay. Now Grady, we were talking to you about an attempted robbery that occurred up at the Shell gas station at 2120 Montana, which occurred on September 25, 1995 . . . about 11:30 at night . . . ah, under . . . it's reported under Oakland Police Department Report No. 95-91681. And, we asked you where you'd been that day and you wanna tell us where you started off?

A: No comment.

Q: 'Kay. Did you tell us that you were at your father's house earlier in the day?

A: No comment.

Q: Grady, were you at the gas station?

A: No comment.

Q: Isn't it true that you just finished telling us that you've never been to the gas station that —

A: No comment.

Q: — you never touched anything, and that you've never touched the gun? Is that true, Grady?

A: No comment.

Q: Grady, did you — you were telling us earlier that you wanted to give a statement, have you now changed your mind, Grady?

A: No comment.

Q: Do you want to give a statement or don't you?

A: No comment, man.

Q: [other voice] So, Grady, what you're saying . . . any question we ask you at this time you're going to say no comment, is that correct?

A: No comment.

Q: No comment. Okay. Well, Grady, I'll go ahead and conclude the interview here, it's uh, 12:03.

This tape recording was referred to by the prosecutor in his opening statement, introduced into evidence, and highlighted in the State's closing argument.

## III.

The state courts unreasonably applied Fifth Amendment law as established by the Supreme Court. The state courts and the federal district court ("prior courts") essentially ignored

Arnold's unequivocal statement that he did not want to talk on tape. The prior courts did not hold that Arnold's statement was equivocal. They simply ignored the statement, instead focusing entirely on Arnold's "no comment" responses when the interrogator turned the tape recorder on despite Arnold's clear statement that he didn't want to talk on tape.[5]

  **[1]** Any reasonable application of the law must begin by recognizing that Arnold clearly and unequivocally invoked his *Miranda* rights selectively, with respect to a tape-recorded interrogation. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (holding that a suspect can selectively invoke *Miranda* rights as to a written statement, but waive them as to oral interrogation; and explaining that the words of a *Miranda* request will be "understood as ordinary people would understand them"). *See also Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975); *Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir. 1988). Any reasonable application of the law must recognize that Arnold's statement precluded the interrogator from turning on the tape recording during the interrogation. *See Miranda,* 384 U.S. at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.").

---

  [5]The state court of appeal noted that, "The sergeant then indicated that he wanted to tape record appellant, and appellant stated that the [sic] did not want to 'talk on tape,' " but passed over this fact in silence. The federal district court fails even to mention this statement of Arnold's, although the court does refer to the court of appeal opinion as setting forth the facts of the case.

  No prior decision in this case has explained why Arnold's first statement can be ignored. It may be that the prior courts operated under the mistaken impression that immediately after invoking the right, Arnold waived it. The state court of appeal stated that after the interrogator turned on the tape recorder, "Appellant reiterated his waiver of *Miranda* rights." It is clear from the record, however, that there was no new waiver, but merely a statement that at the beginning of the interrogation — before Arnold said he didn't want to talk on tape — he had signed a waiver card.

**[2]** The dissenting opinion reasons that Arnold's invocation of his Fifth Amendment right was not unambiguous, analogizing this case, as the prior courts did, to *Davis v. United States*, 512 U.S. 452 (1994), a case involving the invocation of the right to counsel. We have considered, but reject, this argument. The Supreme Court noted in *Davis* that "a suspect need not speak with the discrimination of an Oxford don." *Id.* (internal quotations marks and citation omitted). The words of the request will be "understood as ordinary people would understand them." *Barrett,* 479 U.S. at 529. Thus, in applying *Davis*, neither the Supreme Court nor this court has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than "I have nothing to say."

For example, applying Supreme Court case law, in *United States v. Bushyhead*, 270 F.3d 905 (9th Cir. 2001), we held that the prosecution violated a defendant's Fifth Amendment right to silence under *Miranda* when it introduced at trial the defendant's post-arrest, pre-*Miranda* statement, "I have nothing to say, I'm going to get the death penalty anyway." *Id.* at 912.[6] In *Bushyhead*, the government argued that Bushyhead was not in fact silent, but rather, voluntarily chose to talk to the agent. *Id.* We disagreed, reasoning that Bushyhead's statement constituted "the invocation of silence itself." *Id.* Because *Bushyhead* involved pre-*Miranda* silence, its reasoning applies with even more force here, where the relevant state-

---

[6]We are, of course, mindful of the fact that under 28 U.S.C. § 2254(d), we cannot find constitutional error merely because a state court's decision conflicts with Ninth Circuit precedent. Our cases, however, "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.' " *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). It is in this light and for this purpose that we discuss Ninth Circuit precedent.

ments occurred after Arnold had been given his *Miranda* warnings.[7]

Indeed, we held, after *Davis*, that a suspect unequivocally invoked his right to silence even when he responded affirmatively — when asked whether he desired to have his sworn statement taken regarding his true citizenship and nationality and his activity at the house — with, "Yes, regarding my . . . citizenship." *United States v. Soliz*, 129 F.3d 499, 504 (9th Cir. 1997), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc). We concluded "that this statement constituted an unequivocal invocation of Soliz's right to remain silent on all issues, except his citizenship." *Id.*

[3] In contrast, just as in *Davis*, where a suspect's request for counsel is qualified with words such as "maybe" or "might," we have concluded that the suspect did not unambiguously invoke his right to counsel. Thus, in *Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003), we held that the state court's conclusion that "I think I would like to talk to a lawyer" was not an unambiguous request for counsel was not contrary to clearly established federal law. *Id.* at 1072. Similarly, in *United States v. Doe*, 60 F.3d 544 (9th Cir. 1995), we concluded that "maybe he ought to see an attorney" was not a clear and unambiguous request for counsel. *Id.* at 546. *See also United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994) (contrasting statements qualified with words such as "maybe" with Cheely's unequivocal refusal to waive his right to counsel).

---

[7]The Supreme Court consistently has explained that "*Miranda* warnings contain an implied promise, rooted in the Constitution, that 'silence will carry no penalty.' " *Wainwright v. Greenfield*, 474 U.S. 284 (1986) (quoting *Doyle v. Ohio*, 426 U.S. 610, 618 (1976)); *South Dakota v. Neville*, 459 U.S. 553, 565 (1983) (explaining that *Doyle* rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial").

**[4]** Here, Arnold's statement that he didn't want to talk on tape was neither ambiguous nor equivocal. Indeed, the interrogating officer agreed that Arnold "was specific, he didn't want to talk on tape." Unlike in *Clark*, there is no evidence that Arnold qualified that statement with words of equivocation such as "maybe" or "I think." Arnold's statement wasn't so equivocal or unclear that "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking" his right to remain silent. *Davis*, 512 U.S. at 459 (emphasis in the original).

**[5]** Indeed, it is difficult to imagine how much more clearly a layperson like Arnold could have expressed his desire to remain silent. *See Barrett,* 479 U.S. at 529 (explaining that the words of a request for counsel will be "understood as ordinary people would understand them"). Concluding that Arnold's statement was ambiguous and equivocal would suggest that a suspect never invokes his right to silence unless he intones some sort of talismanic phrase, such as "I invoke my right to silence under the Fifth Amendment." If the statements in *Bushyhead* and *Soliz* constituted invocations of the right to silence, then Arnold's statement that he didn't want to talk on tape — which arguably was even less ambiguous than the statements in those cases — likewise constituted an invocation of his right to silence.

**[6]** In sum, even under the rule set forth in *Davis*, Arnold's statement that he didn't want to talk on tape was clear and unambiguous.[8] Arnold's statements were tantamount to silence and the admission of those statements was a violation of Arnold's Fifth Amendment privilege against self-incrimination. *See* Doyle, 426 U.S. at 618; *United States v. Velarde-Gomez*, 269 F.3d 1023, 1032-33 (9th Cir. 2001) (en banc) (holding that

---

[8]We have left open the question of whether the rule in *Davis*, which involved the invocation of the right to counsel, applies equally to the invocation of the right to silence. *See Soliz*, 129 F.3d at 504 n.3; *Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996).

evidence of suspect's lack of physical or emotional reaction when confronted with discovery of marijuana in his vehicle was tantamount to evidence of silence).

Any reasonable application of the law would then require the government to establish that after saying he didn't want to talk on tape, Arnold waived the right he had, moments earlier, invoked. *See id.* at 475. On this record, it would be objectively unreasonable to determine that Arnold had waived his right not to talk on tape, moments after invoking that right — for no evidence supports such an assertion. The interrogating officer did not testify that Arnold waived his right not to talk on tape. More importantly, the transcript of the tape recording — which, according to the officer, contains the *Miranda* exchange in question — shows that Arnold did not waive that right. As the prosecutor acknowledged in his opening statement, this exchange was merely a reminder that Arnold had previously been advised of his rights.

**[7]** The sole fact the government could cite to establish that Arnold waived his right not to talk on tape — if the prior courts had held the government to its burden — is that, after the interrogator turned on the tape recorder in clear violation of Arnold's unequivocally expressed right, Arnold said "yeah" when the interrogator recited the time and place of the interrogation and the fact of Arnold's *Miranda* waiver of half an hour earlier, and then said "no comment" and "no comment, man" to every substantive question — including the question, "Do you want to give a statement or don't you?" It beggars the imagination to suppose that these responses, when the interrogator turned on the tape recording despite Arnold's clear statement that he didn't want to talk on tape, show that Arnold was waiving the right he had just invoked.

**[8]** Additionally, to prove that Arnold waived his right not to talk on tape, the government would have to show that such a waiver was knowing and voluntary. *See id.* No such showing is possible here. Arnold said he didn't want to talk on

tape. The interrogator responded by turning on the tape recorder anyway. The officer's action implied that Arnold had no right to refuse to talk on tape. And in his summary, on tape, of the *Miranda* warning he gave Arnold half an hour earlier, the interrogator did not add the newly relevant fact that Arnold had a right to refuse to talk on tape even though he had earlier agreed to talk off-tape. Far from ensuring that Arnold knew he had a right to refuse to talk on tape, the interrogator's actions emphatically implied that Arnold had no such right.

**[9]** Any reasonable application of the law must conclude that Arnold's responses during the tape-recorded interrogation could not be used against Arnold at trial. *See id.* at 468 n.37.[9]

## IV.

**[10]** Having decided that the state courts unreasonably applied the law, we must now determine whether that error is harmless under the *Kotteakos* harmless error standard, which applies to non-constitutional error in cases on direct review but also to constitutional error in cases on collateral review, such as we have here. *Brecht*, 507 U.S. at 623. Under this standard, error is harmless if we can say with fair assurance that it did not have a substantial effect, injurious to the defendant, on the jury's decision-making process. *See id.* at 631; *Kotteakos*, 328 U.S. at 765, 776.

---

[9]Even on the question that the prior courts mistakenly focused on — Did the "no comment" responses unequivocally invoke *Miranda* rights? — the courts' determinations are objectively unreasonable. Comparing this case to *Davis* and *United States v. Nordling*, 804 F.2d 1466 (9th Cir. 1986), the prior courts took the phrase "no comment" from its context and considered whether, in the abstract, "no comment" is unambiguous. But we cannot ignore Arnold's first statement, and we do not encounter "no comment" in the abstract, divorced from any context. This case is therefore unlike *Davis* or *Nordling*. In those cases, the suspects being interrogated made no unambiguous statement like Arnold's statement that he didn't want to talk on tape.

In applying this standard, we do not, of course, make factual findings drawing on testimony from the jurors concerning their decision-making process. We conduct a *de novo* review of the record. *Brecht*, 507 U.S. at 642 (Stevens, J., concurring). Upon this review, we attempt to discern "what effect the error . . . reasonably may be taken to have had upon the jury's decision[,]" bearing in mind that "[t]he crucial thing is the impact of the thing done wrong on the minds of other men [and women], not on [our] own, in the total setting." *Kotteakos*, 328 U.S. at 764. *See also Brecht*, 507 U.S. at 643 (Stevens, J., concurring). This Circuit has held that we employ our judgment in this regard independently, "without benefit of such aids as presumptions or allocated burdens of proof." *Mancuso v. Olivarez*, 292 F.3d 939, 950 n.4 (9th Cir. 2002). "[I]f [we] cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos*, 328 U.S. at 765.

At trial in this case, the prosecutor emphasized the importance of the improperly admitted tape recording, offering it as evidence that Arnold is a liar and specifically that Arnold's claim of innocence in this case is a lie. In his opening statement, the prosecutor stated:

> Well, Sergeant Aguirre decided that it was going to be Mr. Arnold's statement and so he wanted to preserve it on the recording, on the tape. Sergeant Aguirre reached over and started to turn on the tape and Mr. Arnold said, "No, no, no, no, no, no, no. I'm not going to talk to you on the tape. I don't want to be recorded." Sergeant Aguirre told him, "Well, I'm going to record this anyhow, what you have to say, and preserve it on tape."

> He started the tape recorder, he reminded Mr. Arnold that he had been advised of his rights, and

Mr. Arnold acknowledged that he had, and began to ask questions about what had occurred at the Shell station. Mr. Arnold's response to every question on-tape was, "No comment, no comment."

During summation, the prosecutor made the following comments:

So Mr. Arnold continues to deny and deny and deny and deny. And Sergeant Aguirre decides he wants to go in and memorialize that denial on tape. Big red flag, tape recording. I don't want nothing on tape. I don't want nothing reported. As long as it's just Grady's words against Sergeant Aguirre, he feels like they're not going to believe him. When they start putting it on tape, you realize you better be careful what you say because it's preserved forever. So I don't want to do that because I'm afraid, because I know that I'm lying and I don't want my reply recorded because at some point in the future I might be able to cook up some good story.

So what happened with [sic] when Sergeant Aguirre goes on tape? No comment. Ever gone to that gas station? No comment. He knows it. He knows his business. No comment.

**[11]** Any effect the recording could have on the jury's decision-making process could only be injurious to Arnold. And given the prosecutor's emphasis on the tape in both his opening statement and his closing argument, we cannot say with fair assurance that the tape recording did not have a substantial injurious effect on the jury's decision-making process.

The government argues that the error in admitting the tape recording was harmless "because the evidence of guilt was compelling," that "the State presented devastating evidence directly connecting [Arnold] to [the crime]." The govern-

ment's argument misapprehends the *Kotteakos* harmless error standard.[10] The question posed for us by that standard is not whether the evidence was sufficient or whether the jury would have decided the same way even in the absence of the error. The question is whether the error influenced the jury. *See Kotteakos*, 328 U.S. at 763-65; *Brecht*, 507 U.S. at 642-43 (Stevens, J., concurring).

[12] In some circumstances, as in *Brecht* itself, we can say with fair assurance that though there was error, it did not substantially influence the jury. Where the prosecutor specifically emphasizes in his opening statement and his closing argument evidence admitted in violation of a defendant's Fifth Amendment rights, we cannot say that evidence had no substantial influence upon the jury.

[13] Additionally, the instruction on adoptive admissions given to the jury — an instruction referring to statements admitted in violation of Arnold's Fifth Amendment privilege — further persuades us that the erroneous admission of Arnold's statements substantially affected the jury. Where a defendant's failure to reply is based on his constitutional right to remain silent, instructing the jury that it can treat the failure to reply as an adoptive admission violates the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 613 (1965); *Franklin v. Duncan*, 70 F.3d 75, 76-77 (9th Cir. 1995) (concluding that prosecutor's reference to defendant's post-*Miranda* silence and trial court's instructions that jury could construe defendant's silence as adoptive admission of truth of direct accusation violated defendant's Fifth Amendment privilege against self-incrimination).

[14] Here, the jury instruction stated that the defendant's silence, "in the face of an accusation . . . charging [the defen-

---

[10]While the point does not determine whether the error was harmless, we do not accept the government's characterization of the evidence against Arnold as "compelling" or "devastating."

dant] with the crime for which [he] is now on trial or tending to connect him with its commission . . . may be considered against him as indicating an admission that the accusation thus made was true." *See* Cal. Jury Instruction — Crim. 2.71.5. Arguably, the interrogating officer's questions "tend-[ed] to connect" Arnold with the commission of the crime for which he was convicted — the questions mentioned the time and location of the robbery, and asked whether Arnold had stated he had never been to that gas station and never touched the gun. By following the instruction on adoptive admission, the jury would have treated Arnold's silence as an admission of the truth of the officer's accusations. Whether Arnold's tape-recorded statement had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, depends in part on how much weight the jury gave the adoptive admission under the trial court's instructions. Given the adoptive admission instruction and the prosecution's stressing of Arnold's silence both in its opening statement and in its closing arguments, we cannot say with fair assurance that the state trial court's erroneous admission of Arnold's tape-recorded statement did not have a substantial and injurious effect upon the jury's verdict.

## V.

**[15]** Because the state courts unreasonably applied Fifth Amendment law clearly established by the Supreme Court, and the error was not harmless, we reverse the decision of the district court. We direct that a conditional writ of habeas corpus issue, requiring the State of California to release Arnold from custody in this case, unless it grants him a new trial to commence within a reasonable period of time to be determined by the district court.

**REVERSED and REMANDED with directions.**

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent.

The state courts did not unreasonably apply clearly established federal law. "[C]learly established Federal law under [28 U.S.C. § 2254(d)(1)] is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). In *Lockyer*, the Supreme Court held, "[a] state court decision is contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 73 (citations omitted).

Here, the state courts relied on *Davis v. United States*, 512 U.S. 452 (1994), in determining that Arnold did not unambiguously invoke his right to silence. Even though *Davis* deals with invoking the right to counsel, the government posits that it should extend to cases involving the right to silence because there appears to be no Supreme Court decision directly on point regarding the right to silence. Although the Ninth Circuit left this question open in *Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996), several of our sister circuits have extended *Davis* to cases involving the right to silence.[1]

*Davis* is instructive here because the factual circumstances in this case are similar. In both cases, the question is whether the suspect invoked Fifth Amendment rights such that police

---

[1]*E.g.*, *James v. Marshall*, 322 F.3d 103, 107 (1st Cir. 2003); *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001); *United States v. Hurst*, 228 F.3d 751, 759-60 (6th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 476-77 (11th Cir. 1996); *United States v. Banks*, 78 F.3d 1190, 1197-98 (7th Cir.), *vacated on other grounds by Mills v. United States*, 519 U.S. 990 (1996).

were required to stop their custodial interrogation. The majority cites no Supreme Court decision directly on point regarding invocation of the right to silence. Accordingly, the state courts' reliance on *Davis* for guidance in this case was reasonable. This is all that needs to be decided under the applicable AEDPA standard.

I would also find that the state courts' determination that Arnold did not unambiguously invoke the right to silence was objectively reasonable in light of the evidence presented. Arnold's "no comment" responses were objectively ambiguous. Indeed, when the interrogating officers asked Arnold on tape whether he had changed his mind about giving a statement, instead of simply answering "yes," he responded "no comment." This response is ambiguous, much like Davis's comment, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455.

In determining whether Fifth Amendment rights were invoked, "likelihood" is not enough. *Id*. at 459. A "law enforcement officer may continue questioning until and unless the suspect clearly requests" to invoke his *Miranda* rights. *Id*. at 461. "The *Edwards* rule seeks to 'maintain a delicate balance between ensuring that suspects are properly insulated against police overreaching while allowing the law enforcement community to perform its duties effectively.' " *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003) (quoting *Smith v. Endell*, 860 F.2d 1528, 1537 (9th Cir. 1988)).[2] Here, the state courts reasonably determined that Arnold did not unequivocally invoke his Fifth Amendment right to silence.

Even if the state courts erred, however, such error was

---

[2]In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Id*. at 484-85.

harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The jury received the following evidence against Arnold: (1) Arnold's fingerprints were found on the window of the cashier's booth where the attempted robbery occurred; (2) Arnold told the primary interrogator, Sergeant Aguirre, (before being informed of the fingerprint evidence) that he had never been to the station "in his entire life," despite multiple attempts to adduce from him possible reasons why he might have been there; (3) Williams, who was with Arnold on the night in question, had already been convicted and had served time for the attempted robbery by the time he testified (i.e., he had nothing to lose by implicating himself and another mysterious participant instead of Arnold); and, (4) Williams testified that (a) he was dating Arnold's sister, (b) he did not want to testify against Arnold, and (c) Arnold approached the booth and tried to buy cigarettes on the night of the attempted robbery. Finally, when Arnold and Williams were arrested just hours after the attempted robbery, officers found a gun that was ballistically matched to the gun fired during the incident.

The majority suggests that whether Arnold's tape-recorded statement had a "substantial and injurious effect" on the jury's verdict depends in part on how much weight the jury gave the adoptive admission instruction. Arnold's defense, however, did not rest solely on his silence — he produced three witnesses who said he was not at the gas station when the attempted robbery occurred. Nevertheless, his defense was seriously undermined by the fact that Williams changed his story twice after telling Sergeant Aguirre that Arnold had actively planned and participated in the robbery, Williams was an admitted heroin addict, and Williams admitted that he had lied to the police regarding the events in question. Additionally, there was no evidence calling into question Sergeant Aguirre's testimony regarding the statement that Arnold voluntarily made before officers turned on the tape recorder.

The evidence to convict was overwhelming, notwithstanding Arnold's "no comment" responses. The error, if any, in

admitting the tape, was unlikely to have had a substantial and injurious effect or influence in determining the jury's verdict. For these reasons, I would affirm the district court's denial of habeas relief.