# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEROME ALVIN ANDERSON,
*Petitioner-Appellant,*

v.

C.A. TERHUNE, Warden,
*Respondent-Appellee.*

No. 04-17237

D.C. No.
CV-00-002494-
WBS

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, Chief Judge, Presiding

Submitted December 5, 2005*
San Francisco, California

Filed November 8, 2006

Before: Alex Kozinski and M. Margaret McKeown,
Circuit Judges, and Michael R. Hogan,** District Judge.

Opinion by Judge Hogan;
Dissent by Judge McKeown

*This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Michael R. Hogan, United States District Judge for the District of Oregon, sitting by designation.

18387

## COUNSEL

Charles M. Bonneau, Sacramento, California, for the petitioner-appellant.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Mary Jo Graves, Senior Assistant Attorney General; Stephen G. Herndon, Supervising Deputy Attorney General; Brian R. Means, Supervising Deputy Attorney General; Craig S. Meyers, Deputy Attorney General; Sacramento, California, for the respondent-appellee.

## OPINION

HOGAN, District Judge:

Petitioner, Jerome Alvin Anderson, appeals the district court's order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Anderson challenges his conviction of special circumstance murder on the grounds that (1)

he was denied his constitutional right to remain silent; and (2) he was denied due process by the introduction of his involuntary confession into evidence, and by the exclusion of evidence of coercion in the interrogation process.

## Facts

Anderson and the victim, Robert Clark, were friends. On the morning of July 9, 1997, a mutual acquaintance, Patricia Kuykendall, discovered that her car had been stolen. Anderson visited Kuykendall's apartment that day and informed Kuykendall that Clark had a habit of borrowing cars, duplicating keys and stealing them later.

Anderson left to bring Clark back to Kuykendall's apartment. Kuykendall and petitioner confronted Clark about the car. Clark denied involvement in the theft. As Kuykendall called the police, Clark left. About ten minutes later, Anderson and Kuykendall's roommate, Abe Santos, followed after Clark.

At about 12:30 or 1:00 p.m. on that afternoon, an employee at Carl's Jr. waited on three people in a white Ford Mustang at the drive-through window. The employee identified Anderson as the driver. At about 1:05 p.m. witnesses noticed a white Mustang with black trim and tinted windows on East Stillwater Road. One witness specifically saw Anderson standing behind the car and two other men standing by the car.

Clark's body was discovered by the side of East Stillwater Road at about 2:30 p.m. He had been shot in the head four times. A methamphetamine pipe lay next to him, and a cigarette lighter was in his hand. Two pieces of hamburger and a fresh cigarette butt were also near the body, as well as spent .22 shell casings. Kuykendall's key was discovered in Clark's pocket.

A search of defendant's car, a white Ford Mustang with black trim and tinted windows, revealed that the tire tracks found near the body were similar to the tire tracks it made. The search also revealed two live .22 rim fire casings under the seats similar to the spent casings found near Clark's body. An analysis of the clothes Anderson wore that day revealed that three small blood stains on his shorts were consistent with Clark's DNA and inconsistent with Anderson's or Santos' DNA.

Authorities took defendant into custody for a parole violation on July 12, 1997, at approximately 8:00 p.m. Officers interviewed Anderson for approximately three and a half hours. The interrogation included the following discussion with Detective O'Connor:

O'Connor: You act like you're cryin' like a baby, an' you can't cry for someone that was a no good . . . an' you killed him for a good reason.

Anderson: No, way! No, way. I — You know what, I don't even wanna talk about this no more. We can talk about it later or whatever. I don't want to talk about this no more. That's wrong. that's wrong.

O'Connor: Right now, you show your remorse.

Anderson: I have nothin' to worry about, nothin' to hide. That's why I show no remorse. Nothin' to worry about, nothin' to hide. He was my friend, an' there's no way I would do it. No, way I would do it.

O'Connor: Were you high that day?

Anderson: No, sir. I — probably was later on. Yes.

O'Connor:  Did you have any dope with you that . . . that day?

Anderson:  No, sir.

O'Connor:  No, dope at all? What do you smoke with?

Anderson:  I smoke with my . . . my fingers.

O'Connor:  When you smoke your dope what do you do with that? How do you smoke that?

Anderson:  You smoke it with pipes and stuff like that.

O'Connor:  Okay. What kind of pipes?

Anderson:  Lines.

O'Connor:  What kind of pipes?

Anderson:  N'ah . . . I would — I —

O'Connor:  Well, what kind of pipes?

Anderson:  Uh! I'm through with this. I'm through. I wanna be taken into custody, with my parole . . .

O'Connor:  Well, you already are. I wanna know what kind of pipes you have?

Anderson:  I plead the fifth.

O'Connor:  Plead the fifth. What's that?

Anderson:   No, you guys are wrong. You guys are
            wrong. You guys have — I've tried to
            tell you everything I know. As far as I
            know, you guys are lying, uh, making
            things up, extenuating and that's not
            right. It's not right.

O'Connor:   We're not makin' anything up.

Anderson:   Sir, sure you are.

O'Connor:   What are we makin' up?

Anderson:   You're tellin' me that I didn't have
            tears in my eyes.

O'Connor:   Yeah.

Anderson:   You're tellin' me, okay, that, uh, uh,
            Abe said I kilt him. That's a lie.

Officers then showed Anderson a videotaped interview in which Abe Santos confessed to watching defendant shoot Clark. Defendant eventually confessed.

## Right to Remain Silent

Anderson asserts that he was denied his constitutional right to remain silent during this exchange. The state court concluded that while the defendant articulated words that could, in isolation, be viewed as an invocation of his right to remain silent, given the totality of the circumstances, the defendant did not intend to terminate the interview. The state appellate court quoted the reasoning provided by the trial court:

The interrogating officer did not continue or reinitiate the interview by posing the question: "plead the fifth. What's that?" The questions can reasonably be

characterized as a request for clarification or confirmation that the defendant wished to assert his right to remain silent, and nothing more. What followed is important to a determination of the question. Specifically, the defendant launched off on a discourse and, ultimately engaged in a debate without making any reference to an invocation of the right to remain silent. It was the defendant, not the interrogators, who continued the discussion.

The appellate court further reasoned that "the interrogating officer testified he believed that in saying, 'I plead the fifth' defendant was simply indicating an unwillingness to discuss the details of his drug use, and not a desire to terminate the interrogation."

[1] The state court thus determined that the detective's further questioning was not inappropriate:

In the present case, the defendant's comments were ambiguous in context because they could have been interpreted as not wanting officers to pursue the particulars of his drug use as opposed to not wanting to continue the questioning at all. By asking defendant what he meant by pleading the fifth, the officer asked a legitimate clarifying question.

If a suspect indicates in any manner during questioning that he wishes to remain silent, interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 473-74, (1966). Any statement taken after invocation of the privilege would constitute the product of compulsion. *Id.* at 474. However, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants [to invoke the privilege]." *Davis v. United States*, 512 U.S. 452, 461 (1994) (holding that the statement, "Maybe I should talk to a lawyer," is not necessarily a request for counsel). Clarifying questions "minimize

the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement." *Id*. "If the suspect's statement is not unambiguous or unequivocal . . . the officers have no obligation to stop questioning." *Id*. at 461-62.

**[2]** Here, Anderson arguably invoked his right to remain silent on two occasions. First, he stated, "I don't even wanna talk about this no more. We can talk about it later or whatever. I don't want to talk about this no more,"[1] and then he stated, "I plead the fifth." Anderson did not express a desire to remain silent in response to the clarifying question. As noted above, the state court concluded that Anderson's comments were ambiguous and that the interrogating officer's question sought clarification. These are the state-court determinations we must review on appeal.

If this case were not before us on 28 U.S.C. § 2254 habeas review, we might be writing a very different opinion. There's definitely more than one way to interpret Detective O'Connor's interrogation. And, the state court's interpretation might not be the most plausible one. But in federal habeas proceedings under AEDPA,[2] great deference is given to state-court factual and legal determinations.

To reverse under AEDPA, we would have to find the state-court conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Rice* v. *Collins*,

---

[1]Anderson does not argue that this was an unequivocal invocation of his right to remain silent.

[2]Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218 (1996) (amending 28 U.S.C. § 2254). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell* v. *Cone*, 535 U.S. 685, 693 (2002) (quoting *Williams* v. *Taylor*, 529 U.S. 362, 403-04 (2000)).

126 S. Ct. 969, 974-76 (2006) (holding that it was *not* unreasonable for a state court to determine that a prosecutor's explanations were race-neutral for *Batson* purposes). Further, state-court factual findings must be "presumed to be correct," and the habeas petitioner "must rebut[ ] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El* v. *Drekte*, 125 S. Ct. 2317, 2325 (2005).

AEDPA similarly requires us to give considerable deference to a state appellate court's legal judgments. In reviewing questions of law, we may not reverse under AEDPA unless the state's court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This inquiry is "straightforward." *Lockyer* v. *Andrade*, 538 U.S. 63, 74-75 (2003). We look to the Supreme Court's "holdings, as opposed to dicta," to determine whether clearly established federal law exists. *Williams* v. *Taylor*, 529 U.S. 362, 412 (2000). And, if clearly established federal law applies, it's not enough for the state court to incorrectly apply the law: "[A]n *unreasonable* application of federal law is different from an incorrect *application*." *Id.* at 409; *see also id.* at 411 ("[A] federal habeas court may not issue a writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

**[3]** We're thus left with only two ways to reverse: First, we would have to find that the state court's factual findings were unreasonable, and petitioner rebutted them with clear and convincing evidence. Or, in the alternative, we would have to hold that this determination was a question of law, and the state court's decision unreasonably applied clearly established federal law. Namely, there would have to be some clear-cut Supreme Court rule that certain magic words automatically bring all questioning to a halt—regardless of the circum-

stances surrounding the interrogation. Here, neither is the case.

**[4]** The state court found, for better or for worse, that Anderson's attempted invocation of his right to remain silent was ambiguous and that the officer's following question legitimately sought clarification. Absent a bright-line rule from the Supreme Court, the state-court conclusion is a reasonable determination of the facts.

### Right to Counsel

**[5]** Anderson also contends that he validly invoked his right to counsel and did not subsequently waive this right prior to the confession. Once Anderson stated "I'd like to have an attorney present," the interrogating officers stopped the interrogation and turned the tape recorder off. However, Anderson unilaterally continued the conversation and asked what was going to happen to him. Accordingly, the interrogating officers were not prohibited from further questioning. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (holding that the question, "Well, what is going to happen to me?" is enough to "initiate" conversation after requesting a lawyer). In response to the officers' statements that they could not talk to him, Anderson clarified that he "was just jokin[g]" and stated "I don't want an attorney. I've changed my mind." Therefore, Anderson validly waived his right to counsel. *See Id.* at 1046.

### Coercion Claims

**[6]** Anderson next argues that the interrogating officers coerced his confession because they withheld basic needs, such as cigarettes and warm clothing, until he agreed to talk, exploited his mental condition brought on by chronic drug use, threatened him with the death penalty and ignored his requests to remain silent. The record does not support a finding of an involuntary confession. *See United States v. Cole-*

*man*, 208 F.3d 786, 791 (9th Cir. 2000) (heroin withdrawal and physical discomfort not enough to establish involuntariness of confession); *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (promise to recommend leniency not enough).

**[7]** Finally, Anderson argues that the trial court improperly excluded evidence of coercion. The state court reasonably concluded that the criminal trial court did not violate the holding of *Crane v. Kentucky*, 476 U.S. 683, 688-91 (1986). Petitioner was not prevented from presenting evidence of the physical and psychological environment that yielded the confession. Exclusion of purported expert testimony of petitioner's self-image and other aspects of the voluntariness of the confession, if error, was harmless.

\* \* \*

The standard of review is critical here. Under AEDPA, we must give deference to state-court factual and legal determinations, which in this case are reasonable in light of the evidence presented in the state-court proceedings and the lack of clearly established federal law to the contrary. The district court's judgment denying Anderson's petition for writ of habeas corpus is therefore **AFFIRMED.**

McKEOWN, Circuit Judge, dissenting:

It is likely that few Americans can profess fluency in the Bill of Rights, but the Fifth Amendment is surely an exception.[1]

---

[1]As early as 1955, the Supreme Court recognized that "in popular parlance and even legal literature, the term 'Fifth Amendment' in the context of our time is commonly regarded as being synonymous with the privilege against self-incrimination." *Quinn v. United States*, 349 U.S. 155, 163 (1955); *accord In re Johnny V.*, 149 Cal. Rptr. 180, 184, 188 (Cal. Ct. App. 1978) (holding that the statement "I'll take the fifth" was an assertion of the Fifth Amendment privilege.)

From television shows like "Law & Order" to movies such as "Guys and Dolls," we are steeped in the culture that knows a person in custody has "the right to remain silent." *Miranda* is practically a household word. And surely, when a criminal defendant says, "I plead the Fifth," it doesn't take a trained linguist, a Ph.D, or a lawyer to know what he meant.

Here, Anderson said, "I don't even wanna talk about this no more," "Uh! I'm through with this," and "I plead the Fifth." The officer did not stop questioning but instead responded, "Plead the Fifth. What's that?", continued the questioning, and ultimately obtained a confession. It is rare to see such a pristine invocation of the Fifth Amendment and extraordinary to see such flagrant disregard of the right to remain silent. Under even the narrowest construction of AEDPA,[2] the state court erred in failing to recognize this constitutional violation. I respectfully dissent from the majority's view that there was some ambiguity in Anderson's unequivocal invocation of the Fifth Amendment such that clarifying questions were permitted.

The continued questioning violated the Supreme Court's bright-line rule established in *Miranda v. Arizona*. Once a person invokes the right to remain silent, all questioning must cease:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken

---

[2]Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a writ of habeas corpus may not be granted unless the state court's decision (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

384 U.S. 436, 473-74 (1966).

The expansion of legitimate clarifying questions to cover this situation is contrary to, and an unreasonable application of, clear Supreme Court precedent. Additionally, even a cursory examination of the interrogation transcript reveals that the state court made an unreasonable determination of the facts in evaluating Anderson's *Miranda* claim. Anderson's invocation was not ambiguous, and only one reasonable conclusion can be gleaned from his statements, especially his last declaration, "I plead the Fifth:" he invoked his right to remain silent and wanted to end the interrogation.

## I.   THE INTERROGATION

After an initial interview about the murder, Anderson was brought to the police station for further questioning. The relevant portion of the transcript is so extraordinary that it bears repeating. Despite clear and repeated invocations of his right to remain silent, the officers continued to question Anderson about the murder:

> Officer: You act like you're cryin' like a baby, an' you can't cry for someone that was a no good . . . an' you killed him for a good reason.

> Anderson: No, way! No, way. I — You know what, I don't even wanna talk about this no more. We can talk about it later or whatever. I don't want to talk about this no more. That's wrong. That's wrong.

> Officer: Right now, you show your remorse.

Immediately after this exchange, the officer continued to interrogate Anderson regarding his drug use on the day of the murder, including whether Anderson had used pipes. This questioning is significant because the murder victim was found with a pipe next to him. The entire conversation was about the murder. In response to this questioning, Anderson unambiguously indicated that he wanted to end the interrogation by stating that he was "through with this," wanted to "be taken into custody" and "I plead the Fifth":

Anderson: I have nothin' to worry about, nothin' to hide. That's why I show no remorse. Nothin' to worry about, nothin' to hide. He was my friend, an' there's no way I would do it. No, way I would do it.

Officer: Were you high that day?

Anderson: No, sir. I — probably was later on. Yes.

Officer: Did you have any dope with you that . . . that day?

Anderson: No, sir.

Officer: No, dope at all? What do you smoke with?

Anderson: I smoke with my . . . my fingers.

Officer: When you smoke your dope what do you do with that? How do you smoke that?

Anderson: You smoke it with pipes and stuff like that.

Officer: Okay. What kind of pipes?

Anderson:    Lines.

Officer:     What kind of pipes?

Anderson:    N'ah . . . I would — I —

Officer:     Well, what kind of pipes?

Anderson:    Uh! I'm through with this. I'm through. I wanna be taken into custody, with my parole . . .

Officer:     Well, you already are. I wanna know what kind of pipes you have?

Anderson:    I plead the [F]ifth.

Officer:     Plead the [F]ifth. What's that?

Anderson:    No, you guys are wrong. You guys are wrong. You guys have—I've tried to tell you everything I know. As far as I know, you guys are lying, uh, making things up, extenuating and that's not right. It's not right.

Officer:     We're not makin' anything up.

Anderson:    Sir, sure you are.

Officer:     What are we makin' up?

Anderson:    You're tellin' me that I didn't have tears in my eyes.

Officer:     Yeah.

Anderson:    You're tellin' me, okay, that, uh, uh, Abe said I kilt him. That's a lie.

The questioning continued until Anderson asked for a law-
yer: "I'd like to have an attorney present." At that juncture,
the police turned off the tape recorder and, somewhat suspi-
ciously, following this hiatus, the officer concluded that
Anderson wanted to reinitiate the discussion. The questioning,
which took place over a three-hour period, led to a confession
by Anderson.

## II.  IN CLEAR VIOLATION OF *MIRANDA*, THE STATE COURT UNREASONABLY CONCLUDED THAT ANDERSON'S INVOCATION ("I PLEAD THE FIFTH") WAS AMBIGUOUS

Against this backdrop, the state court accurately recognized
that Anderson unambiguously invoked his right to remain
silent when he stated, "I plead the Fifth," but then went on to
eviscerate that conclusion by stating that the comments were
"ambiguous in context":

> In the present case, the defendant's comments were
> ambiguous in context because they could have been
> interpreted as not wanting officers to pursue the par-
> ticulars of his drug use as opposed to not wanting to
> continue the questioning at all. By asking defendant
> what he meant by pleading the fifth, the officers
> asked a legitimate clarifying question.

Using "context" to make an unambiguous invocation
ambiguous defies both common sense and established
Supreme Court law.

Although the Supreme Court has observed that in invoking
a constitutional right, "a suspect need not 'speak with the dis-
crimination of an Oxford don,' " *Davis v. United States*, 512
U.S. 452, 459 (1994) (quoting *id.* at 476 (Souter, J., concur-
ring)), Anderson would meet even this erudite standard. This
is not a case where the officers or the court were left scratch-
ing their heads as to what Anderson meant. Nothing was

ambiguous about the statement "I plead the Fifth."[3] That invocation should have brought an immediate end to questioning. *Miranda*, 384 U.S. at 473.

Instead of honoring the request, the interrogating officers decided to "play dumb," hoping to keep Anderson talking by responding, "Plead the Fifth. What's that?" This effort to keep the conversation going was almost comical. The officer knew what "I plead the Fifth" meant. It is baffling that the state court determined that "[b]y asking defendant what he meant by pleading the Fifth, the officers asked a legitimate clarifying question." Nothing needed clarification. What about the words "I plead the Fifth" would be unclear, ambiguous, or confusing to a reasonable officer? *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (holding in the context of the invocation of the right to counsel that "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous"). Rather, the officer hoped Anderson would explain more about the murder, the exact topic he did not want to talk about. They knew that continuing the interrogation was "reasonably likely to elicit an incriminating response" from Anderson. *Rhode Island v. Innis*, 446 U.S. 291, 303 (1986). And they were right.

The Supreme Court has countenanced clarifying questions only to ascertain whether the suspect actually invoked the right to remain silent. *See, e.g.*, *Miranda*, 384 U.S. at 444-45 (focusing only on the threshold question of whether the accused "indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking" when deciding whether police had honored their Fifth Amendment rights); *Edwards v. Arizona*, 451 U.S. 477,

---

[3]*See Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005) (holding, with respect to a defendant who said that he did not want to talk on tape, that "it is difficult to imagine how much more clearly a layperson . . . could have expressed his right to remain silent.").

484-85 (1981) (focusing on whether accused had actually "expressed his desire" for, or "clearly asserted" his invocation of his Fifth Amendment rights); *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (holding that "[t]his case concerns the threshold inquiry: whether Smith invoked his right to counsel in the first instance"). Ignoring this principle, the state court found that the comments were ambiguous "because they could have been interpreted as not wanting officers to pursue the particulars of his drug use as opposed to not wanting to continue the questioning at all."

While the majority defers to this far-fetched reasoning, the rationale for the state court decision falls of its own weight. The police did not ask Anderson what subject he did not want to discuss; nor did any of their follow-up questioning address this topic. The state court's characterization is a fanciful re imagining of the colloquy between Anderson and the police, and under AEDPA, certainly an unreasonable determination of the facts. Significantly, the question can hardly be characterized as one to clarify or double-check whether Anderson invoked his right to remain silent, the only legitimate clarifying inquiry authorized by Supreme Court precedent. *Smith*, 469 U.S. at 95. The state court's conclusion that "[i]t was the defendant, not the interrogators, who continued the discussion," ignores the bedrock principle that the interrogators should have stopped all questioning. A statement taken after the suspect invoked his right to remain silent "cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474. Finally, even taken on its own terms, the majority's factual hair-splitting is mistaken. It makes no sense to split hairs and say that maybe, just maybe, Anderson wanted to talk about the murder and not about his drug use because, in fact, the drug use was inextricably intertwined with the murder. It is precisely this kind of hair-splitting that the Supreme Court wanted to avoid when it fashioned the bright-line rule in *Miranda*. *Davis*, 512 U.S. at 461 (noting that the benefit of the bright-line rule is the "clarity and ease of application" that can be applied by officers in the

real world without "unduly hampering the gathering of information" by forcing them to make "difficult judgment calls" with a "threat of suppression if they guess wrong"). No guess work was required here.

But under the majority's interpretation of *Miranda* and its progeny, every time a suspect unequivocally invokes the right to remain silent, the police can ask follow-up questions to clarify whether he really, *really* wants to invoke the right and to parse the subject matter—"what specifically do you not want to talk about?" The majority's holding allows the police to turn the Fifth Amendment into a game of "Twenty Questions," permitting the police to continue the interrogation and forcing the suspect to take a multiple choice quiz. Such a practice is tantamount to endless re-interrogation.

Where the initial request to stop the questioning is clear, "the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." *Barrett*, 479 U.S. at 535 n.6 (Brennan, J., concurring). By parsing Anderson's invocation into specific subjects, the police "failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Michigan v. Mosley*, 423 U.S. 96, 105-06 (1975). The net result is that such follow-up questions allow "the authorities through 'badger-[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[to] wear down the accused and persuade him to incriminate himself." *Smith*, 469 U.S. at 98.

Looking at this case through the AEDPA lens of deference does nothing to change my conclusions. The state court's decision to ignore an unambiguous declaration of the right to remain silent is directly contrary to *Miranda*. To the extent the question is one of interpretation of *Miranda* and related Supreme Court precedent, the state court's interpretation is flatly unreasonable. *See Runnels*, 421 F.3d at 867. And to

characterize Anderson's statements as ambiguous was certainly an unreasonable finding of fact.

## III.  THE STATE COURT ACTED CONTRARY TO SUPREME COURT PRECEDENT BY USING ANDERSON'S RESPONSES TO RE-INTERROGATION TO FIND A VALID WAIVER

The state appellate court attempted to bolster its conclusion about Anderson's statements by claiming that he waived his right to remain silent in continuing to answer police questions after he stated, "I plead the Fifth":

> By continuing to talk to the police officers, defendant demonstrated a willingness to continue to discuss the case . . . . Accordingly, while words of invocation were spoken by the defendant, the court concludes that, in any case, he effectively waived the right to remain silent by what followed.

Put another way, the state court suggests that because the officers ignored Anderson's unequivocal invocation of the Fifth Amendment, their questioning caused him to keep talking, resulting in a waiver of his right to remain silent. This analysis directly contravenes clear Supreme Court precedent, thereby providing another ground upon which to grant the writ under § 2254(d)(1).

*Smith* mandates that all questioning must immediately cease once the right to remain silent is invoked, and that any subsequent statements by the defendant in response to continued interrogation cannot be used to find a waiver or cast ambiguity on the earlier invocation. The Supreme Court's somewhat lengthy but crystal clear recitation of this principle bears repeating:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these

circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together. . . .

With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." Using an accused's subsequent responses to cast doubt on the adequacy of the initial request itself is even more intolerable. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all."

*Smith*, 469 U.S. at 98-99 (internal citations omitted).

The prejudice from Anderson's confession cannot be soft pedaled, and the error was not harmless. *Brecht v. Anderson*, 507 U.S. 619, 623 (1993). I would grant the writ of habeas corpus.