**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DALE R. HURD,
　　　　　　*Petitioner-Appellant,*

v.

C.A. TERHUNE; ATTORNEY GENERAL
OF THE STATE OF CALIFORNIA,
　　　　　　*Respondents-Appellees.*

No. 08-55162

D.C. No.
CV-99-11311-
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
April 7, 2010—Pasadena, California

Filed August 23, 2010

Before: Harry Pregerson, Robert R. Beezer and
David R. Thompson, Circuit Judges.

Opinion by Judge Beezer

## COUNSEL

Philip M. Brooks, Berkeley, California, for the petitioner-appellant.

Blythe J. Leszkay, Deputy Attorney General, Los Angeles, California, for the respondents-appellees.

## OPINION

BEEZER, Circuit Judge:

Dale R. Hurd petitions for a writ of habeas corpus following his first-degree murder conviction in California state court and resulting life sentence without the possibility of parole. At trial, the state court allowed the prosecution to present Hurd's refusal to reenact the shooting of his wife during police interrogation as affirmative evidence of his guilt. The California Court of Appeal affirmed Hurd's conviction and held that the admission as evidence of Hurd's refusal to perform a reenactment was not in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Doyle v. Ohio*, 426 U.S. 610 (1976). Hurd petitioned for a writ of habeas corpus in the United States District Court for the Central District of California. The district court denied Hurd's petition, and Hurd timely appealed. Because the California courts' application of *Miranda* and *Doyle* was unreasonable, we reverse the decision of the district court and direct that a writ of habeas corpus issue.

## I

On March 3, 1995, Hurd was convicted of the first degree murder of his wife, Beatrice ("Bea"), following a second trial by jury. Hurd's first trial resulted in a hung jury and a mistrial. The jury in Hurd's second trial found that Hurd carried out the murder of his wife for financial gain, a special circumstance making Hurd eligible for a sentence of death or life without the possibility of parole under section 190.2 of the California Penal Code. The jury also found that Hurd used a firearm in the commission of a felony, adding a mandatory consecutive sentence of up to ten years under section 12022.5 of the California Penal Code. Based on these findings, the trial court sentenced Hurd to a term of life imprisonment without the possibility of parole, plus a consecutive term of four years.

Hurd appealed his conviction to the California Court of Appeal, which affirmed the trial court. Hurd petitioned the Supreme Court of California and the Supreme Court of the United States for review. Both courts denied his petitions. On October 28, 1999, Hurd petitioned for a writ of habeas corpus in the United States District Court for the Central District of California. On November 20, 2007, the district court denied that petition. Hurd appeals.

## A

Hurd and Bea had been married for eight years at the time of her death in April 1993. In March 1993, Bea separated from Hurd and sought the counsel of an attorney. Bea's attorney estimated that Hurd would owe her between $2,800 and $3,300 per month in alimony upon their divorce. At that time, Hurd earned $8,593 per month. On April 1, 1993, Bea served Hurd with divorce papers.

On April 16, 1993, Bea took their two children, aged four and eight, to Hurd's house, where the children spent the night. The next morning, Bea arrived to pick up the children and brought with her a stack of typed papers. Bea was upstairs with Hurd when their son, downstairs, heard a shot. Bea, crying, walked down the stairs before collapsing. Hurd descended the stairs behind her and took their son outside. Hurd reentered the house and called 911. An ambulance arrived and took Bea to the hospital, where she died from a single bullet wound to the chest.

Investigation showed that the shot was fired from a distance of one to six inches. The bullet entered Bea's chest from left to right, front to back, at a 35- to 40-degree downward angle. Bea's face and scalp had abrasions and bruises apparently suffered before her death.

Hurd testified that when Bea arrived at his house on the day of the incident, Bea expressed concern over possible rioting

following the pending verdict in the second Rodney King trial.[1] Hurd told Bea that he would let her borrow his firearm and show her how to operate it. Standing in front of Bea, Hurd attempted, with difficulty, to load a round into the firearm. Hurd testified that as he lowered the firearm to inspect it, it accidentally discharged.

**B**

Police arrived at Hurd's house and found him sitting motionless near the front entrance, next to Bea. Police took Hurd into custody and informed him of his *Miranda* rights. Hurd expressed his willingness to talk without an attorney present, and Detective Carr began questioning him.

After Hurd recounted his version of the facts, Carr asked Hurd to submit to a polygraph examination. Carr assured Hurd that, if the polygraph showed that Hurd was being truthful, the police department would end its investigation of him. Hurd declined to undergo the polygraph exam and explained that he believed them to be unreliable. Carr replied, "I think you don't want to take one because you murdered your wife." Carr then repeatedly suggested that Hurd take a polygraph. Hurd maintained that he would not.

---

[1]On April 29, 1992, four white Los Angeles police officers were acquitted of assaulting Rodney King, a black man, despite a widely publicized videotape of them tasing him, kicking him and repeatedly striking him with their batons. After the verdict was announced, riots erupted throughout the city, eventually causing over $1 billion in property damage and leaving more than 50 people dead with over 4,000 injured and 12,000 arrested. *See* Staff of the L.A. Times, *Understanding the Riots: Los Angeles Before and After the Rodney King Case* (1996).

Three months later, a federal grand jury indicted the same officers on federal civil rights charges. Robert Reinhold, *U.S. Jury Indicts 4 Police Officers in King Beating*, N.Y. Times, August 6, 1992. On April 17, 1993, the jury announced its verdict convicting two of the four officers. Seth Mydans, *Verdict in Los Angeles; 2 of 4 Officers Found Guilty in Los Angeles Beating*, N.Y. Times, April 18, 1993. In the days leading up to this verdict, the city braced itself for riots similar to those of 1992. *Id.*

Carr next asked Hurd to demonstrate how the shooting occurred. Hurd refused to reenact the shooting. Carr continued to question Hurd about the chain of events and again asked Hurd to demonstrate. When Hurd declined, Carr suggested that Hurd either take a polygraph or demonstrate what happened. Hurd refused, and Carr suggested that Hurd would go to jail for being uncooperative. Carr's supervisor, Detective Straky, entered the room and explained that the District Attorney would not think much of Hurd's refusals to cooperate.

Carr and Straky continued to ask Hurd to demonstrate how the shooting took place, and Hurd continued to refuse. The detectives suggested that a judge and jury would find his lack of cooperation unreasonable. Through the remainder of the questioning, Straky and Carr asked for a reenactment several more times, with Hurd refusing each time.

## C

Before trial, Hurd moved to suppress statements made at his interrogation as involuntary based on the investigating detectives' multiple false promises of leniency for cooperation, false assurances, and coercive statements. Hurd argued that the voluntariness of the interrogation ended when Carr threatened to jail Hurd if he refused to submit to a polygraph examination. Hurd further argued that his repeated refusals to submit to a polygraph or reenact the shooting were invocations of his constitutional right to remain silent and that his responses to that line of questioning were therefore inadmissible. The trial court denied Hurd's motion, concluding that Hurd did not effectively invoke the protections of the Fifth Amendment because he offered responses and explanations instead of flat refusals. Throughout Hurd's trial, the prosecution referred to Hurd's refusal to reenact the shooting as affirmative evidence of his guilt. In his opening statement, the prosecutor played the tape of Hurd's interrogation and counted the number of times he refused to demonstrate the

shooting. The prosecutor referred to Hurd's refusals again while presenting his case-in-chief and during his closing argument.

At trial, the prosecution also relied on testimony from several witnesses regarding Bea's prior statements detailing instances of physical abuse in her marriage. The court instructed the jury that this testimony "was admitted solely for the purpose of showing Bea Hurd's state of mind" and that it should not be considered for any other purpose. The court also instructed the jury that evidence of past crimes "may not be considered . . . to prove that [Hurd] is a person of bad character or that he has a disposition to commit crimes" and that it "may be considered . . . only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged." The court further instructed that evidence of past crimes must be weighed "in the same manner . . . as all other evidence in the case."

## II

We review de novo a district court's denial of a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. *Christian v. Frank*, 595 F.3d 1076, 1080 (9th Cir. 2010). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we grant a petition if the "last reasoned" state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When evaluating the state court's application of federal law, circuit precedent is "persuasive authority." *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).

A state court decision is contrary to federal law if it "applies a rule that contradicts the governing law as set forth" by

the Supreme Court or reaches a different result on a "materially indistinguishable" set of facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court unreasonably applies federal law when it "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts" of its case. *Bell*, 535 U.S. at 694.

## III

Hurd argues that he is entitled to habeas relief on three separate bases. We first address Hurd's argument that the state trial court improperly admitted as evidence his refusal to reenact the shooting in violation of his Fifth Amendment rights as determined by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Doyle v. Ohio*, 426 U.S. 610 (1976). Because we conclude that the *Doyle* error in this case serves as an adequate basis to grant Hurd's petition for a writ of habeas corpus, we decline to consider Hurd's arguments that his jury instructions violated the Due Process Clause or that the admission of Bea's out-of-court statements violated the Confrontation Clause. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (holding that "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them").

## A

### 1

In *Miranda*, the Supreme Court decided several consolidated cases in which criminal suspects had been held in police custody and interrogated without being advised of their right to remain silent. 384 U.S. at 440. The Court held that whenever a criminal suspect is subjected to custodial interrogation, he must be warned of his right to remain silent and informed that any statement he makes can be presented as evidence in

court. *Id.* at 444. These warnings are a procedural safeguard[2] necessary to "secure the privilege against self-incrimination." *Id.* When these procedural safeguards are not used, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Id.*

**[1]** The Court also indicated that a suspect may rely on his right to remain silent selectively: "The mere fact that [the suspect] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445. Indeed, once a suspect indicates "at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74.

**[2]** The Court further developed its Fifth Amendment jurisprudence in *Doyle*, another group of consolidated cases. In *Doyle*, each of the defendants had been arrested and informed of his *Miranda* rights. 426 U.S. at 611. At trial, each defendant took the stand and offered exculpatory testimony. *Id.* To impeach that testimony, the prosecution asked each defendant on cross-examination why he had not told the same story when he was initially informed of his rights and questioned. *Id.* The Court held that this type of impeachment was improper because *Miranda* warnings contain an implicit promise that silence will carry no penalty. *Id.* at 618-19. The Court explained that a criminal defendant's reliance on his right to remain silent may not be used against him in any way at trial, including for impeachment. *Id.* The Court reasoned that *Miranda* warnings make a suspect's silence "insolubly ambiguous" because that silence could be "nothing more than [an] exercise of these *Miranda* rights." *Id.* at 617.

---

[2]The Court later explained that this procedural safeguard is, in fact, a constitutional rule that cannot be superseded by statute. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000).

Next, the Court decided *Anderson v. Charles*, a case in which a criminal defendant had been arrested while driving a stolen car. 447 U.S. 404, 404 (1980). Police suspected the defendant of murder at the time of his arrest because the rightful owner of the car had recently been strangled to death. *Id.* After the arrest, police informed the defendant of his rights. *Id.* at 405. The defendant then told police that he stole the car near a bus station. *Id.* At trial, however, the defendant testified that he stole the car from a different location. *Id.* On cross-examination, the prosecutor impeached the defendant's testimony with his prior inconsistent statement. *Id.* at 405-06. After considering these facts, the Court held that while *Doyle* "prohibits impeachment on the basis of a defendant's silence," it does not "apply to cross-examination that merely inquires into prior inconsistent statements." *Id.* at 407-08. The Court explained that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408.

Recently, the Supreme Court decided *Berghuis v. Thompkins*, a case in which a criminal defendant was arrested on suspicion of having committed a shooting. 130 S. Ct. 2250, 2256 (2010). Upon the defendant's arrest, police officers informed him of his rights and interrogated him for three hours. *Id.* Though the defendant remained "largely silent" during the interrogation, he offered intermittent answers to the officers' questions. *Id.* at 2256-57. The defendant ultimately made an inculpatory statement about 2 hours and 45 minutes into his interrogation. *Id.* at 2257. The Supreme Court held that this inculpatory statement was made voluntarily and could be admitted as evidence. *Id.* at 2263. The defendant's silence in response to the majority of the police officers' questions, however, was not admitted at his trial, nor was it deemed admissible by the Supreme Court. *See id.* at 2257-58.

**[3]** Here, the California Court of Appeal held, "A defendant has no right to remain silent selectively. Once a defen-

dant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that the refusal was an invocation of *Miranda* rights."[3] *People v. Hurd*, 73 Cal. Rptr. 2d 203, 209 (Cal. Ct. App. 1998). The court explained that because Hurd "talked freely and voluntarily" about how the shooting occurred, he could not invoke *Miranda* solely as to the officers' request that he perform a demonstration. *Id.* The court interpreted *Doyle* as allowing a prosecutor to comment on "[Hurd's] refusal to provide critical details, when he had voluntarily waived his right to remain silent." *Id.* It then concluded that "there was no evidence that [Hurd's] refusal to demonstrate the shooting or take a polygraph was based upon an invocation of his *Miranda* rights." *Id.*

[4] The California Court of Appeal's *Miranda* and *Doyle* analysis is incorrect.[4] The Supreme Court has clearly established that, after receiving *Miranda* warnings, a suspect may invoke his right to silence at any time during questioning and that his silence cannot be used against him at trial, even for impeachment. *See Doyle*, 426 U.S. at 618-19; *Miranda*, 384 U.S. at 473-74. *Miranda* does not apply only to specific subjects or crimes. It applies to every question investigators pose. *See Miranda*, 384 U.S. at 445 ("The mere fact that [a criminal defendant] may have answered some questions . . . does not deprive him of the right to refrain from answering any further inquiries."). The Court's opinion in *Anderson* does not alter its holdings in *Miranda* or *Doyle*. *Anderson* applies in cases where a defendant waives his *Miranda* rights and answers an officer's questions only to offer conflicting testimony at trial. *See Anderson*, 447 U.S. at 407-08. In these cases, the prosecu-

---

[3]The court did not address the fact that this case deals not only with the prosecution's use of Hurd's silence for impeachment purposes, but also with the prosecution's use of Hurd's silence in its opening and throughout its case-in-chief.

[4]Because the state court correctly identified the governing law, we rely on "unreasonable application" analysis. *See Bell*, 535 U.S. at 694.

tion may impeach that testimony with the defendant's prior inconsistent statement. *See id. Anderson* explains that a prior inconsistent statement is much different from silence and does not enjoy the same protections under the Fifth Amendment. *See id. Anderson* cannot be read to allow the use of a defendant's silence at trial as evidence of guilt. *See id.*

The Court's opinion in *Michigan v. Mosley*, decided before *Doyle*, also does not change our analysis. In *Mosley*, the Court held that police may question a suspect about a crime after that suspect has indicated his unwillingness to answer questions about a different, unrelated crime. 423 U.S. 96, 105-06 (1975). This holding does not alter the basic principle that a suspect may invoke his right to silence "at any time." *Miranda*, 384 U.S. at 473-74. Contrary to the conclusion of the California Court of Appeal, the right to silence is not an all or nothing proposition. A suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial.[5] *Id.*

Furthermore, the Supreme Court's decision in *Thompkins* does not alter its holdings in *Miranda* or *Doyle*. *Thompkins* makes clear that a criminal defendant must affirmatively and unambiguously invoke his right to remain silent if he wishes to cut off police interrogation. *See* 130 S. Ct. at 2260. When a suspect remains "largely silent" in response to officers' questions, the interrogation does not automatically have to cease. *Id.* At the same time, when a defendant remains silent or refuses to answer a question posed by police, that silence or refusal is inadmissible. As the Court held in *Doyle*, a defendant's silence in response to a question is ambiguous

---

[5]The state trial court concluded that Hurd's refusal to demonstrate the shooting of his wife was not protected by the Fifth Amendment because Hurd claimed that he *could* not reenact the shooting instead of saying that he could but *would* not reenact the shooting. The Constitution makes no such distinction.

because it may be no more than a reliance on the right to silence. 426 U.S. at 618-19. That silence may not require police to end their interrogation, but it also does not allow prosecutors to use silence as affirmative evidence of guilt at trial. *Thompkins* stands for the proposition that a voluntary confession should not be suppressed just because a defendant has refrained from answering other questions. *See* 130 S. Ct. at 2262-63. It does not alter the fundamental principle that a suspect's silence in the face of questioning cannot be used as evidence against him at trial, whether that silence would constitute a valid invocation of the "right to cut off questioning" or not. *See id.* (quoting *Mosley*, 423 U.S. at 103 (internal quotation marks omitted)).

**[5]** The Court of Appeal's opinion further conflicts with circuit precedent, which we review as persuasive authority. The Ninth Circuit holds that clearly established law allows a suspect to refuse to be interviewed in a particular manner even if he has already waived that right with respect to the subject matter of the interrogation. *See Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005) (holding that a suspect may refuse to be interviewed on tape when he had already waived his right to silence). Other circuits agree. *See, e.g.*, *United States v. Johnson*, 816 F.2d 918, 922 n.4 (3d Cir. 1987) (discussing a suspect's right to remain silent after submitting to a polygraph); *United States v. Amaro*, 816 F.2d 284, 286 (7th Cir. 1987) (discussing a suspect's right to refuse to speak to FBI agents while waiving his right and speaking to prison officials). Other circuits also agree that clearly established law allows a suspect to remain silent selectively. *See United States v. May*, 52 F.3d 885, 890 (10th Cir. 1995) (holding that clearly established law allows a defendant to remain " 'partially silent' by answering some questions and refusing to answer others" (quoting *United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993)); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) (holding that "a suspect may . . . refuse to answer certain questions, and still be confident that

*Doyle* will prevent the prosecution from using his silence against him").

**[6]** The state court therefore incorrectly read and applied the law as clearly established by the Supreme Court in *Miranda* and *Doyle*. Still, we may only grant habeas relief under the "unreasonable application" test if the state court's application of law was not only incorrect, but also objectively unreasonable. *Williams*, 529 U.S. at 409.

**2**

**[7]** As clearly established federal law prohibits the use of a criminal defendant's post-*Miranda* silence against him in court, a reasonable application of the law requires the government to establish that Hurd either waived his right to remain silent or never effectively invoked it. *See Arnold*, 421 F.3d at 866. Here, Hurd unambiguously invoked his right to silence when the officers requested that he reenact the shooting. Hurd responded to the officers' requests by saying, among other things, "I don't want to do that," "No," "I can't," and "I don't want to act it out because that—it's not that clear."

The government first argues that the above statements cannot be invocations of *Miranda* under clearly established federal law because they are not unambiguous. *See Thompkins*, 130 S. Ct. at 2260. Yet a suspect still need not utter a "talismanic phrase" to invoke his right to silence. *Arnold*, 421 F.3d at 866. Instead, it is enough if the suspect says that he wants to remain silent or that he does not want to answer that question. *See Thompkins*, 130 S. Ct. at 2260. Here, Hurd's responses were objectively unambiguous in context—he repeatedly refused to perform the demonstration in no uncertain terms. *Cf. Arnold*, 421 F.3d at 867 n.9 (explaining that the phrase "no comment" in context unambiguously demonstrated the suspect's unwillingness to be interviewed on tape). In fact, "it is difficult to imagine how much more clearly a layperson . . . could have expressed his desire to remain silent" than

Hurd did in this case. *Id.* at 866. Furthermore, the interrogating officers' comments show that they subjectively understood Hurd's responses as unambiguous refusals.

The government next argues that *Doyle* does not apply to this case because the interrogating officers told Hurd that the jury would not look favorably on his refusal to cooperate, abrogating *Miranda* by suggesting that his refusals would be used in court.[6] Officers cannot make a suspect's constitutionally protected silence admissible by issuing warnings or threats. A suspect's right to silence is based in the Fifth Amendment, not in an individual officer's promises or lack thereof. *Dickerson*, 530 U.S. at 444; *Miranda*, 384 U.S. at 468 & n.37. And a suspect's reliance on his right to silence simply cannot be used against him in court—it is "fundamentally unfair and a deprivation of due process" to allow a suspect's silence to be used against him at trial. *Doyle*, 426 U.S. at 618. Furthermore, it is improper to speculate on the reasons for a suspect's post-*Miranda* silence. As explained in *Doyle*, a suspect's "post-arrest silence is insolubly ambiguous" as it may be no more than the suspect's reliance on his *Miranda* rights. *Id.* at 617.

The government's final argument is that Hurd's refusals to perform the demonstration were not actually refusals because he offered explanations instead of simply saying "no." This argument fails. The Ninth Circuit has already held that clearly established law allows a suspect to invoke his right to silence through an explanatory refusal. *See United States v. Bushyhead*, 270 F.3d 905, 912 (9th Cir. 2001) (holding that defendant's statement, "I have nothing to say, I'm going to get the death penalty anyway" was a valid invocation of the right to silence). Again, neither the Constitution nor *Miranda* require a suspect to invoke his right to silence in a particular way.

---

[6]Though the issue is not before the court and we do not decide it, the coercive nature of these threats calls into serious question the voluntariness of any of the suspect's following statements.

They simply mandate that once a suspect has invoked that right, he cannot be punished for it. *See Doyle*, 426 U.S. at 618-19; *Miranda*, 384 U.S. at 473-74.

The California Court of Appeal incorrectly and unreasonably applied clearly established law. Still, Hurd is not entitled to habeas relief if the error was harmless.

**B**

**[8]** *Doyle* error does not entitle a petitioner to habeas relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We conduct this inquiry de novo, "without benefit of such aids as presumptions or allocated burdens of proof." *Mancuso v. Olivarez*, 292 F.3d 939, 950 n.4 (9th Cir. 2002). If, reviewing the facts as a whole, we are able to determine with fair assurance that the judgment was not substantially swayed by the error, we may conclude that the error was harmless. *Kotteakos*, 328 U.S. at 765. Otherwise, we must conclude that the petitioner's rights were substantially and injuriously affected. *Id.*

When the prosecutor's impermissible argument comments on a defendant's post-*Miranda* silence, the court attempts to determine not "whether the jury would have decided the same way even in the absence of the error," but "whether the error influenced the jury." *Arnold*, 421 F.3d at 869. In making this determination, the court considers "(1) the extent of [the] comments . . ., (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting [the] defendant's guilt." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1034-05 (9th Cir. 2001) (en banc).

In *Brecht*, the Supreme Court held that *Doyle* error did not influence the jury because the prosecution's references to the defendant's post-*Miranda* silence were infrequent, comprising

fewer than two pages of the 900-page trial transcript. *See* 507 U.S. at 639. The Court also concluded that the errors were cumulative as part of the prosecution's permissible and extensive references to the defendant's pre-*Miranda* silence. *See id.* And the Court determined that the errors were immaterial in the face of the otherwise "overwhelming" evidence of guilt. *See id.*

**[9]** Here, the prosecutor's comments on Hurd's silence were extensive and stressed an inference of guilt to the jury. Unlike *Brecht*, the prosecutor specifically emphasized Hurd's post-*Miranda* silence in his opening statement and closing argument. In his opening statement, the prosecutor said:

> One thing—and I'm going to play the tape for this in particular—you need to listen to on the tape is a number of times Detective Carr asked [Hurd] to demonstrate how the shooting occurred, to stand up and to demonstrate it. And you will listen to the fact that the defendant says, "I will not do a demonstration." And you can count the times that he refuses.

The prosecutor again suggested that the jury make an inference of guilt based on Hurd's silence in his closing argument:

> Now, the one thing that I wanted to make reference to, and I asked Mr. Hurd this question, and if you want to count the times which I did, Carr and Straky on nine separate occasions asked that—the defendant to demonstrate how the shooting occurred . . . . And on nine separate occasions the defendant refused to do a demonstration, and the response was it wasn't crystal clear. And in court he's told you that there is a dream-like quality as to what occurred, and that he still won't or can't—and I suggest won't—do a demonstration.

The government argues that the prosecution's references to Hurd's silence were attempts to impeach Hurd's credibility,

but, as shown above, the prosecutor made particular reference to Hurd's silence to imply guilt. Because the prosecutor repeatedly stressed Hurd's silence to the jury as evidence of his guilt, we cannot say with fair assurance that this evidence did not substantially influence the jury. *Cf. Arnold*, 421 F.3d at 869.

**[10]** Also, the other evidence suggesting Hurd's guilt is not extensive. Unlike in *Brecht*, the evidence suggesting Hurd's guilt consists entirely of testimonial evidence—expert testimony suggested that the physical evidence was not inconsistent with Hurd's version of events. In contrast, the defendant's testimony in *Brecht* was directly contradicted by the physical evidence. *Brecht*, 507 U.S. 639. Based on our review of the record, we conclude that Hurd's rights were substantially and injuriously affected by the prosecutor's multiple references to his post-*Miranda* silence at trial. The California courts' error is not harmless.

## IV

**[11]** Because the California courts unreasonably applied the law as clearly established by the Supreme Court, and we conclude that the error was not harmless, we reverse the decision of the district court. We direct that a writ of habeas corpus issue, requiring the State of California to release Hurd from custody, unless the state elects to retry Hurd within a reasonable period of time to be determined by the district court.

**REVERSED and REMANDED with directions.**