NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RACARDO JACKSON, | No. 21-15676 |
| Petitioner-Appellee, | D.C. No. 2:14-cv-02268-MCE-DB |
| v. | |
| KEN CLARK, Warden, | MEMORANDUM* |
| Respondent-Appellant. | |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted November 16, 2022
San Francisco, California

Before: McKEOWN and SUNG, Circuit Judges, and SESSIONS,** District Judge.
Dissent by Judge SUNG.

The government appeals from the district court's order granting Racardo

Jackson's 28 U.S.C. § 2254 petition for writ of habeas corpus. We have

jurisdiction under 28 U.S.C. §§ 1291 and 2253(a), and we reverse.

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable William K. Sessions III, United States District Judge
for the District of Vermont, sitting by designation.

The district court erred by granting Jackson's petition as to his prosecutorial misconduct claim because, even assuming the prosecutor violated Jackson's Fifth Amendment right to silence under *Doyle v. Ohio*, 426 U.S. 610 (1976), any error was harmless. "*Doyle* error does not entitle a petitioner to habeas relief unless the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hurd v. Terhune*, 619 F.3d 1080, 1089–90 (9th Cir. 2010) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622, 637–38 (1993)).

Here, "the judgment was not substantially swayed" by the prosecutor's comments because, at trial, there was significant other evidence that Jackson did not shoot Troy Thompson in self-defense. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946). For example, trial testimony revealed that Jackson sought a confrontation with Thompson twice, including leaving a female acquaintance's apartment over her protests to meet Thompson face-to-face right before the fatal shooting. The same acquaintance—who was in her apartment while Jackson shot Thompson outside and interacted with Jackson after the shooting—testified that Jackson did not tell her he shot Thompson in self-defense or that Thompson threatened him. Forensic evidence corroborated eye-witness testimony that Jackson fired about five shots at Thompson then fired a final shot while "standing over" him. The prosecutor also argued at trial that Jackson "acted like a guilty man" by failing to call the police or an ambulance after the shooting and by

2

burying the gun he used. Finally, the full transcripts of Jackson's police interviews that the prosecutor used to comment on Jackson's silence were admitted into evidence at trial. The transcripts revealed that Jackson never referenced self-defense in his interviews. Accordingly, the last reasoned decision of a state court, in this case the California Court of Appeal, did not reach a conclusion that was contrary to or that involved an unreasonable application of clearly established law by holding that any *Doyle* error was harmless. *See Godoy v. Spearman*, 861 F.3d 956, 962 (9th Cir. 2017) (en banc).

The district court also erred by granting Jackson's petition as to his ineffective assistance of counsel claim. Because there is no state court ruling on the merits of the ineffective assistance of counsel claim, we review "the district court's decision de novo without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1)." *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005). Although Jackson's trial counsel did not object to the prosecutor's use of his selective silence at trial, Jackson has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" *Cullen v. Pinholster*, 563 U.S. 170, 196

3

(2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 689–90), and it is unclear that the trial court would have sustained an objection about the use of Jackson's silence such that the judgment would have been different. Jackson has not overcome "*Strickland*'s high bar." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017).

**REVERSED**.

*Racardo Jackson v. Ken Clark*, No. 21-15676

SUNG, Circuit Judge, dissenting:

Petitioner Racardo Jackson challenges his conviction for second-degree murder of Troy Thompson. In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that when a prosecutor uses a defendant's post-*Miranda* silence to impeach the defendant's statements at trial, the prosecutor violates due process. *Id.* at 611, 618-19. That is exactly what the prosecutor did here. When the police arrested Jackson, they gave him a *Miranda* warning, explaining, "You have the right to remain silent; Anything you say may be used against you in court." When the police asked Jackson to tell his "side of" the story, Jackson refused to answer. Instead, he explained that he was afraid the police would twist his words and use them against him. Jackson told his side of the story for the first time at trial, testifying that he shot Thompson in self-defense. In violation of Jackson's due process rights, the prosecutor repeatedly used Jackson's post-Miranda silence to impeach his credibility, arguing that if Jackson truly shot Thompson in self-defense, he would have told the police when they interrogated him.

The district court granted relief, concluding after careful analysis that the prosecutor's use of Jackson's silence for impeachment purposes violated his due process rights under *Doyle* and that the error was not harmless. The majority reverses because in their view, "any *Doyle* error was harmless." The majority's harmless error analysis ignores that Jackson's defense turned on his credibility, which was substantially diminished by the prosecutor's repeated use of Jackson's silence to impeach him. The majority's harmlessness analysis also relies on other evidence of Jackson's guilt but

1

ignores the evidence in the record that rebuts the prosecution's case and corroborates Jackson's account of self-defense.

Under these circumstances, I, like the District Court, have "grave doubts about whether the error affected the jury in a substantial way." When a judge is "left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011). Consequently, I would affirm the grant of habeas relief.

## I. *Doyle* Violation

The prosecutor may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about *his failure to have told the story* after receiving *Miranda* warnings at the time of his arrest." *Doyle*, 426 U.S. at 611 (emphasis added). As noted above, that's exactly what the prosecutor did here.

The police interrogated Jackson twice after arresting him and issuing *Miranda* warnings. Detective Cohen, Jackson's primary interrogator, repeatedly tried to persuade Jackson to tell his "side" of the story. Although Jackson did not stand mute, he never told the police his side of the story or any details about what occurred. Instead, Jackson explained why he did not want to tell his side of the story to the police. For example, when Detective Cohen told Jackson, "So if you want to set the record straight go ahead," Jackson responded, "But that's going to be like . . . I mean can we get – I don't know about – I know you the police." And when Detective Cohen asked, "And you keep it to yourself how does that help me to a full investigation? How does that help you 'cause

2

you – it seems to me your feeling your voice hasn't been heard in this?" Jackson responded, "Yeah, but now I'm not, I mean exactly what you're saying. . . . Now if I do it's like y'all can just use that against me at the same time without nobody like standing up for me." And, when Detective Cohen persisted, telling Jackson. "but if you have information that you think I need to know like I said I can't get it from looking at you," Jackson again explained why he did not want to answer: "I'm saying like I don't want to you know I don't have a lawyer right now" and "I don't know how much to go about saying. . . . it may help me, it may hurt me, you know what I'm saying but I don't know. . ."

At trial, Jackson told his side of the story, testifying that Troy Thompson tried to shoot him and he shot Thompson in self-defense. The prosecutor repeatedly cross-examined Jackson about the fact that he had not told that exculpatory story to the police during his post-*Miranda* interrogations. For example, the prosecutor asked Jackson, "At no time did you ever say: Troy Thompson tried to kill me, and I shot him in self-defense, right?" And then, during closing argument and rebuttal, the prosecutor repeatedly argued that the jury should not believe Jackson because he never told the police that he had acted in self-defense. For example, the prosecutor argued: "if he lawfully killed Mr. Thompson, don't you think that would have been the first thing out of his mouth when he starts talking to Detective Cohen, all right[?] But he never says that. And you know why he doesn't say that, it's as simple as this: Because it didn't happen that way."

The constitutional rule at issue—that the prosecutor violates due process by using the defendant's post-*Miranda* silence for impeachment purposes—is clearly established. *Doyle*, 426 U.S. at 611. As the Court explained, when a defendant is informed that he may "remain silent" and "that anything he says may be used against him," "it does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference may be drawn as to the truth of his trial testimony." *Id.* at 619 (quoting *United States v. Hale*, 422 U.S. 171, 182-183 (1975) (White, J., concurring). "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id*.

Yet, the California Court of Appeal, in the last reasoned state court decision, concluded there was no *Doyle* violation because Jackson "did not remain silent." *People v. Jackson*, No. A132659, 2013 WL 3039798, at *23 (Cal. Ct. App. June 19, 2013). Specifically, the Court of Appeal explained that, in its view, "[t]he prosecution was not commending [sic] on defendant's silence" but instead merely "not[ing] that in all of defendant's comments to the detective and others he never claimed that he acted in self-defense." *Id*. That is, the state court concluded that the prosecutor could comment on Jackson's failure to have told his exculpatory story to the police, just because Jackson

was not *literally* silent during the interrogation. That conclusion involved an unreasonable application of clearly established federal law.

*Doyle* and subsequent cases make clear that a defendant does not need to remain literally silent to exercise his right to remain silent and bar the prosecutor from commenting on his "failure to have told the exculpatory story after receiving *Miranda* warnings at the time of his arrest." *Doyle*, 426 U.S. at 611. To begin, Doyle, like Jackson, was not literally silent when the police interrogated him. *Id.* at 614 n.5. In response to a police question, Doyle said, "I don't know what you are talking about" or "What's this all about?" *Id.*[1] Yet, the Court still characterized Doyle's "failure to have told the police" his exculpatory story as "post-arrest silence." *Id.* at 611. *See also Anderson v. Charles,* 447 U.S. 404, 407 n.2 (1980) (per curiam) (explaining that, in *Doyle*, one defendant *did* speak to police but the Court still analyzed the due process question "as if both defendants had remained silent").[2] Thus, even in *Doyle*, the Court used the term "silence" figuratively to refer to the defendant's failure to tell an exculpatory story, not literally to refer to

---

[1]     The dissent in *Doyle* also pointed out that the defendants did not "st[and] mute," and that "Doyle did not even remain silent." *Doyle*, 426 U.S. at 628-29 (Stevens, J., dissenting).

[2]     In *Anderson*, the Court explained that the prosecution does not violate *Doyle* by impeaching a defendant based on a prior inconsistent statement, as opposed to an omission or "silence." 447 U.S. at 407 n.2 (finding no *Doyle* violation because the defendant had told the police that he stole a car from the street but testified that he stole a car from a parking lot). That is not an issue in this case, because Jackson did not make a prior inconsistent statement.

muteness. Under *Doyle*, the fact that Jackson "never claimed that he acted in self-defense" during the police interrogation means that he was "silent" about his exculpatory story, and the prosecutor could not comment on that silence to impeach him. The fact that Jackson did not remain literally silent makes no difference.

This circuit's cases confirm that "post-*Miranda* silence" under *Doyle* does not mean literal silence. For example, in *United States v. Bushyhead*, 270 F.3d 905, 913 (9th Cir. 2001) we explained, "[w]ith respect to post-*Miranda* warnings 'silence,' . . . silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted. *Id.* (quoting *Wainwright v. Greenfield*, 474 U.S. 284, 294 n.13 (1985)).[3]

A defendant may invoke their right to remain silent by providing "explanatory refusals" to answer the police's questions, as Jackson did here. *Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010). In *Hurd*, we held that the defendant invoked his right to silence even though he "offered explanations instead of simply saying 'no.'" *Id.* at 1088-89 (noting that Hurd responded to the interrogating officers' requests that he perform a

---

[3]     In *United States v. Bushyhead,* we found that the admission of defendant's statement "I have nothing to say, I'm going to get the death penalty anyway" impermissibly infringed on his constitutional right to remain silent, rejecting the government's argument that Bushyhead "was not silent, but rather voluntarily chose to talk to the agent." *Bushyhead*, 270 F.3d at 912, 913. We distinguished Bushyhead's case from *Rhode Island v. Innis*, 446 U.S. 291 (1980) by noting that, unlike in *Innis* where the defendant interrupted officers while being transported to the police station post-arrest to tell them about the location of a missing weapon, "Bushyhead's statement was not an unsolicited confession but the invocation of silence itself." *Id*.

demonstration "by saying, among other things, 'I don't want to do that,' 'No,' 'I can't,' and 'I don't want to act it out because that—it's not that clear'"). Indeed, we held that Hurd was "silent" when he refused to perform a demonstration—and that the prosecutor violated *Doyle* by commenting on that silence—even though Hurd had consented to the police interrogation without an attorney present *and* recounted his version of the facts. *Id.* at 1084, 1086-87. We emphasized that "the right to silence is not an all or nothing proposition" and "[a] suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial." *Id.* at 1087.

Jackson sufficiently invoked his right to silence to preclude the prosecutor from commenting on his silence under *Doyle,* even if his invocation "f[ell] short of the unambiguous declaration required to invoke the right to counsel . . . or the right to cut off questioning." *United States v. Garcia-Morales*, 942 F.3d 474, 476 (9th Cir. 2019). "Even in non-invocation cases . . . mere omissions are not enough to justify cross-examination or argument regarding what was not said at the time of arrest." *United States v. Caruto,* 532 F.3d 822, 831 (9th Cir. 2008) (distinguishing omissions (which are protected under *Doyle*) from inconsistencies (which are not protected)).[4]

---

[4] Although these cases make clear that Jackson did not need to invoke his right to silence unambiguously to preclude the prosecutor from commenting on his silence, I note that Jackson's refusals to tell his exculpatory story were objectively unambiguous, and

Thus, under *Doyle*, Jackson sufficiently invoked his right to remain silent by refusing to tell the police his exculpatory story, and the prosecutor violated Jackson's Due Process rights by impeaching him based on his post-*Miranda* silence. Further, here, as in *Hurd*, "the California Court of Appeal incorrectly and unreasonably applied clearly established law" by concluding that the prosecutor's comments on Jackson's refusal to tell police his exculpatory story was not *Doyle* error just because Jackson was not literally silent. 619 F.3d at 1088-89.

## A. Prejudice

"*Doyle* error does not entitle a petitioner to habeas relief unless the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hurd*, 619 F.3d at 1089–90 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622, 637–38 (1993), quoting *Kotteakos*, 328 U.S. at 776). "When the prosecutor's impermissible argument comments on a defendant's post-*Miranda* silence, the court attempts to determine not 'whether the jury would have decided the same way even in the absence of the error,' but 'whether the error influenced the jury.'" *Hurd,* 619 F.3d at 1090. "In making this determination, the court considers (1) the extent of [the] comments ..., (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other

---

the interrogating officer's repeated attempts to convince Jackson to tell his side of the story show that the officer "subjectively understood [Jackson's] responses as unambiguous refusals" to answer. *Cf. Hurd*, 619 F.3d at 1089.

evidence suggesting [the] defendant's guilt." *Id.* (quoting *United States v. Velarde Gomez*, 269 F.3d 1023, 1034–35 (9th Cir.2001) (en banc)).

In this case, the district court conducted a detailed analysis of the record and found that Jackson's "credibility was extremely important to his defense," and that "[t]he prosecution did far more than mention [Jackson's] refusal to tell Cohen he acted in self-defense. Rather, the prosecutor focused on that fact and stressed that it showed [Jackson] was not credible."

I agree. Jackson's "testimony was the key to his claim of self-defense" and the prosecution used Jackson's post-*Miranda* silence to impeach him. "[T]he record shows that a primary focus of the prosecutor's comments and questioning on the issue of petitioner's silence focused on petitioner's failure to tell [police] that he acted in self-defense." Indeed, "[t]he prosecutor asked petitioner numerous questions on cross-examination about the fact he never told [police] the victim had threatened him, never told [police] he shot Thompson in self-defense, and never told [police] his side of the story."

Unlike in other cases where courts have found that *Doyle* error was harmless, the prosecutor in this case did not simply make "infrequent" references to Jackson's post-*Miranda* silence or comments that were "merely cumulative" extensions of other "permissible references." *Brecht*, 507 U.S. at 622, 637–38. Rather, in this case, as in *Hurd*, the prosecutor's comments on Jackson's silence "were extensive and stressed an inference of guilt to the jury." 619 F.3d at 1090.

9

The prosecutor repeatedly cross-examined Jackson on his refusal to tell police his exculpatory story, asking *at least nine times* various iterations of the same question: "You did not say to Detective Cohen that . . . Thompson tried to kill you, right?" (Her many iterations included: "At no point did you ever tell [the detective] that Troy Thompson tried to shoot you or tried to kill you and that you had to kill him in self-defense, right?"; "You didn't tell [the detective] your side of the story, right?"; "At no time during the course of this conversation, did you ever mention self-defense to Detective Cohen, right?"; "You've never mentioned self-defense during these interviews, correct?"; "[Y]ou never once mentioned the words self-defense in that interview, right?")

The prosecutor also specifically emphasized Jackson's silence during closing argument and rebuttal, repeatedly asserting that his silence during interrogation *must* mean he made up his exculpatory story for trial. For example, the prosecutor asked the jury: "if he lawfully killed Mr. Thompson, don't you think that would have been the first thing out of his mouth when he starts talking to Detective Cohen, all right [?] But he never says that. And you know why he doesn't say that, it's as simple as this: Because it didn't happen that way."

The prosecutor told the jury that they could consider what Jackson told Detective Cohen, and then painted the following picture:

> "Detective Cohen is about as likable a guy as you can get. This is a guy who's talking with the defendant and wants to get his side of the story, right. Asks him twelve ways to Sunday what his side of the story is. And at any given time, this defendant could have told him, 'This guy tried to kill me, so I shot him in self-defense.' And you've got to think about it like this: If it was you and you had been wrongly accused of something and you knew you had acted lawful, wouldn't the

first thing out of your mouth be, 'I did this in self-defense. This dude tried to kill me.'

\* \* \*

'I did this in self-defense because this dude tried to kill me.; That would be the first thing out of your mouth, right. For whatever reason, maybe because he didn't realize the cops were on to him or whatever, but in those ten days [between the shooting and the interrogation], he definitely hadn't come up with a good enough story yet, because, well, you never heard it, right." [5]

On rebuttal, she drove the point home further: "I mean, for God's sake, he didn't tell Detective Cohen. I mean, I heard his little story for the first time just like you."

In sum, the prosecutor argued to the jury at least eight times that Jackson's silence during the interrogation must mean he was lying at trial. She repeatedly asserted that "the first thing out of a reasonable person's mouth" during interrogation would be "I did this in self-defense," and that Jackson's failure to say so meant that his account was fabricated.

The government argues that the prosecutor's commentary on Jackson's silence was harmless because recordings of Jackson's interrogations were played for the jury and

---

[5] The prosecutor's closing argument was riddled with such statements: "The first thing out of his mouth [during the post-*Miranda* interview] wasn't, 'Oh my God, you know, this person tried to kill me, and I had to save myself.' No."; "At any given time, this defendant could have told [the detective], 'this guy tried to kill me, so I shot him in self-defense.'"; "Wouldn't the first thing out of your mouth be, 'I did this in self-defense. This dude tried to kill me.'"; "I did this in self-defense because this dude tried to kill me.' That would have been the first thing out of your mouth, right."; "A reasonable person, the first thing out of a reasonable person's mouth is, 'This dude tried to kill me, and I shot him in self-defense.'"; "if he shot Mr. Thompson in self-defense, I guarantee you . . . what he would be saying is, '[y]ou know what, he tried to kill me."; ["if it was self-defense] don't you think that would have been the first thing out of his mouth when he starts talking to Detective Cohen . . .")

11

enabled them "to reach the same inferences the prosecutor urged." But Jackson's interrogation responses were entirely consistent with his self-defense claim—so if the prosecutor had not repeatedly urged the jury to infer from Jackson's silence that he was lying and *guilty*, the jury may not have done so. Indeed, without the prosecutor's spin, the jury may well have found that Jackson's interrogation responses *corroborated* his testimony that he acted in self-defense. Jackson repeatedly told Detective Cohen that things did not happen as the police believed and that he had a side of the story to tell. And, without the prosecutor's comments, the jury may also have accepted Jackson's explanatory refusals as the truth: that Jackson believed he had an exculpatory defense but was afraid to tell it to Detective Cohen for fear that the police would somehow use something he said against him (as Detective Cohen had just warned could happen) and because he did not have a lawyer with him.

The majority concludes that the *Doyle* error was harmless because "there was significant other evidence" that Jackson did not act in self-defense. But that evidence is much weaker than the majority acknowledges. The majority states that "[f]orensic evidence and eyewitness testimony corroborated" that Jackson fired a final shot while "standing over" Thompson. But the forensic pathologist who performed Thompson's autopsy testified that he could not determine the position of Thompson's body while he was being shot, and that the evidence was also consistent with Jackson's account of what occurred: that Thompson was standing when he was shot, and that Jackson was backing away while firing. The record also shows that the main eyewitness, a man in a

12

neighboring apartment, may have been distracted during the shooting, and that his view of the shooting was limited by the fact that it was night out and his apartment was dimly lit. The eyewitness also gave different accounts on direct and cross-examination about when exactly he turned to see the shooting. And a defense expert testified that the location of the bullet casings was not inconsistent with any of the witnesses' testimony—including Jackson's.

The majority also points to the testimony of Jackson's acquaintance, who said that Jackson did not mention being threatened or acting in self-defense when he left the scene. But any inference of guilt that can be drawn from his mere failure to explain what happened while fleeing the scene is weak. Further, other parts of the acquaintance's testimony supported Jackson's account. For example, she testified that Thompson pointed a gun at her a few months before the shooting. On the night of the shooting, Thompson sent her multiple texts and called her multiple times, pounded on her door, and yelled at her from the parking lot. She may have told Jackson that Thompson had a gun on the night of the shooting, and though she did not recall seeing Thompson with one, both she and Jackson testified that Thompson had his hand in his jacket pocket, and both were apparently concerned he may have one. There also was other evidence that Thompson had been violent with people in the past, and DNA evidence corroborated Jackson's testimony that he took Thompson's gun.

The majority also notes that the prosecutor argued that Jackson "acted like a guilty man" immediately after the shooting because Jackson fled and hid his gun and

13

Thompson's gun instead of calling the police.[6] But Jackson's post-shooting conduct—

like his post-*Miranda* silence—was not inherently inconsistent with having shot someone

in self-defense. The prosecutor argued that the jury should infer guilt from that conduct,

but that is not the only inference that could be drawn. Because the forensic evidence was

inconclusive, and the eyewitness testimony was not unassailable, the prosecutor's

repeated commentary on Jackson's post-*Miranda* silence was not "immaterial in the face

of otherwise *'overwhelming'* evidence of guilt." *Hurd*, 619 F.3d at 1090 (quoting *Brecht*,

507 U.S. at 639) (emphasis added).

Ultimately, Jackson's self-defense claim turned on his credibility. And "a

constitutional error that goes directly to the defendant's credibility usually is not harmless

where the defendant's theory of the case is plausible, even if it is not particularly

compelling." *Caruto*, 532 F.3d at 832 (citing *Velarde–Gomez*, 269 F.3d at 1035)

(internal quotations omitted). Even considering the forensic evidence and eyewitness

testimony against Jackson, his exculpatory story of self-defense remains plausible.

Given that Jackson's credibility was extremely important to his defense, it makes

sense that the prosecutor attacked his credibility as she did. The prosecutor clearly

believed that using Jackson's post-*Miranda* silence to impeach him could substantially

influence the jury. Thus, even when I assume that the forensic evidence and eyewitness

---

[6]     The prosecutor's argument—that Jackson would have called the police if he truly had acted in self-defense—ignores that Jackson may have had reasons to fear that the police would not believe him, or to fear the police in general.

testimony are as strong as the majority suggests, I "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the" prosecutor's *Doyle* error. *Kotteakos*, 328 U.S. at 765. "[T]he uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). Because, like the district court, I have grave doubt that the prosecutor's *Doyle* error was harmless, "the conviction cannot stand." *Kotteakos*, 328 U.S. at 765.

## II. Ineffective Assistance of Counsel

I also agree with the district court that Jackson established a Sixth Amendment ineffective assistance of counsel claim because his trial attorney acted unreasonably by failing to object when the prosecutor questioned him about his post-*Miranda* silence and failing to renew her pretrial motion to bar the prosecutor from commenting on his silence during closing arguments. Trial counsel knew the prosecutor's use of post-*Miranda* silence was unconstitutional under *Doyle* and the trial court had not rendered a final ruling on the issue. Further, there is a "reasonable probability" that had counsel objected and the prosecutor had been barred from repeatedly arguing to the jury that Jackson's failure to tell the police his exculpatory story meant he was making it up, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

I would affirm the grant of Jackson's habeas petition.