Filed 10/25/13  P. v. Brummitt CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SHILOH RAYWOLFGANG BRUMMITT,<br><br>     Defendant and Appellant. | B239265<br><br>(Los Angeles County<br>Super. Ct. No. MA052447) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles Chung, Judge.  Affirmed.

Mary Jo Strnad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Shiloh Raywolfgang Brummitt appeals his convictions, after a jury trial, of false imprisonment by violence, kidnapping, criminal threats, assault with a deadly weapon, disobeying a domestic relations order, and battery. We affirm.

## BACKGROUND

The Los Angeles County District Attorney filed an information charging Brummitt with false imprisonment by violence (Pen. Code, § 236; count 1),[1] corporal injury to a spouse (§ 273.5, subd. (a); count 2), kidnapping (§ 207, subd. (a); count 3), criminal threats (§ 422; count 4), assault with a deadly weapon (§ 245, subd. (a)(1); count 5), disobeying a domestic relations court order (§ 273.6, subd. (a); count 6), and battery (§ 243, subd. (e)(1); count 7).

As to count 4, it was further alleged that Brummitt personally used a deadly and dangerous weapon (a bayonet) in the commission and attempted commission of the offense (§ 12022.1, subd. (b)(1)). As to counts 1 through 5, it was alleged that Brummitt suffered one prior conviction within the meaning of the "Three Strikes" law (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)). As to counts 3 through 5, it was further alleged that Brummitt suffered one prior serious felony conviction (§ 667, subd. (a)(1)). As to count 6, it was further alleged that the offense resulted in physical injury. Brummitt pleaded not guilty and denied the special allegations.

The jury found Brummitt not guilty on count 2, found him guilty as charged on the remaining counts, and found true the personal use of a deadly weapon allegation appended to count 4. The trial court sentenced Brummitt to a total term of 12 years and four months in state prison.

At trial the evidence showed the following.

## A. April 8, 2011 Arrest

On April 8, 2011, Nancy Pinagel called 911 from outside her home and reported that her husband, Brummitt, had assaulted her earlier that day. Pinagel told the 911

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

operator that Brummitt picked her up from work and pulled her hair while the car was in a parking lot. When Pinagel tried to leave the car, Brummitt beat her on the head and pulled her into the back seat. Pinagel informed the 911 operator that Brummitt threatened to kill her if she left him.

Los Angeles County Sheriff Deputies Teresa Steen and Donald Chavez arrived on scene and spoke to Pinagel. Pinagel appeared distraught and shaken, and she was crying. Pinagel informed the deputies that while she and Brummitt were parked at a McDonald's drive-thru "Brummitt[ ] became angry with her . . . because he believed she was cheating on him with . . . black men. [¶] [Brummitt] . . . grabbed her by the back of her hair and slapped her about five times across . . . [the] face. [¶] [Pinagel] opened . . . the passenger . . . door [to escape]. [Brummitt] grabbed her and . . . pulled her back inside." They drove home where Pinagel called 911.

Pinagel's face appeared red and swollen. Deputy Steen asked Pinagel if she would like a protective order, which Pinagel accepted.

Deputies arrested Brummitt. After they notified him of his *Miranda*[2] rights, Brummitt began rambling incoherently about rape kits and Pinagel "messing around with different black men." Pinagel said nothing when deputies asked her what Brummitt was talking about other than that was his normal state. Pinagel bonded out Brummitt on April 10, 2011 and took him home.

## B.      April 13, 2011 Arrest

At around 6:00 a.m. on April 13, 2011, Pinagel called a coworker, Cindi Geddes, at the Palmdale Mental Health Clinic, where Pinagel worked as a psychiatrist. Pinagel whispered to Geddes, "'I'm in trouble'" or "'I need help.'" She then quickly reverted to a normal tone and conversation. Geddes knew Brummitt was with Pinagel because she could hear him in the background and he took the phone from Pinagel to speak to Geddes several times.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

Geddes was concerned. On April 7 or 8, 2011, Pinagel had told Geddes that Brummitt had acted violently towards her and about Brummitt's arrest at McDonald's. Geddes was further concerned when Brummitt told her Pinagel would not be coming into work that day. Pinagel asked Geddes to get her patients' medical records from the building, which Geddes knew to be illegal. Pinagel also asked Geddes for gas money. Attempting to establish whether Pinagel was in trouble, Geddes asked if she should contact Pinagel's first patient that day, "Rod." Pinagel said she should. "Rod" was the security officer at the hospital, Deputy Rodney Bell.

Geddes notified Deputy Bell of her concerns. Brummitt was arrested in a parking lot near the hospital. A video of deputies attempting to arrest Brummitt showed him telling deputies that he worked for the FBI and a local law firm, saying he had recordings of three sexual assaults against Pinagel, and asking for his medication. A red pillowcase containing a hatchet, knives and two decorative bayonets was found in Brummitt's car.

Pinagel was interviewed on camera in a patrol car at the scene of the arrest. Pinagel told deputies that she bonded Brummitt out of jail and told him to leave the house. The night of April 12, Brummitt woke her up around 11:30 p.m. He had his hand on her neck and asked, "'What the hell is going on? What the hell is going on?'" He then said, "'You need to get your ass up and get dressed.'" Pinagel got up and Brummitt stabbed the bed five times with a bayonet. Brummitt made Pinagel lie on the floor, grab the blade of the bayonet with both hands and place the tip in her nose. Brummitt then applied slight pressure with his foot saying, "'You just don't know who the F I am.' . . . 'Don't F with me.'"

Brummitt grabbed one of Pinagel's expired credit cards and drove around with her. The card was declined at at least two gas stations. At each stop, Pinagel tried to communicate with the gas station attendants with no success. Pinagel told deputies she was afraid Brummitt would beat her. Brummitt told Pinagel that she wasn't going to work the next day, because she needed to go to the hospital. Brummitt made Pinagel call Geddes at 6:00 a.m. Pinagel said she requested the medical records hoping Geddes

4

would understand something was wrong. Pinagel understood what Geddes meant when Geddes said Pinagle's first patient was "Rod."

Brummitt and Pinagel went to the parking lot next to the hospital to wait for Geddes and the money. Deputies pulled into the parking lot behind Brummitt and Pinagel. Pinagel said she was in fear at that time that Brummitt would do something. At one point while they were waiting in the parking lot, Brummitt told Pinagel someone was going to die.

After Brummitt's arrest Pinagel consented to a search of her house. Deputies recovered a mattress with five to six puncture marks. Pinagel later identified the bayonet she said Brummitt used to stab the mattress and made her place in her nose.

## C.    Pinagel's Recantation

Pinagel recanted her claims against Brummitt at the preliminary hearing and trial. Pinagel said she had been diagnosed with posttraumatic stress disorder (PTSD) from sexual abuse as a child. Pinagel testified that under stress she has symptoms "like clips from a movie . . . running . . . fast forward . . . and [seemingly] real." During these episodes Pinagel confuses the past with the present.

Pinagel testified that the stress triggering her symptoms resulted from two related events. Pinagel and Brummitt had been having problems with their former landlords, the Fahey family. Pinagel and Brummitt moved from the Faheys' property after Mr. Fahey threatened them. The Faheys were demanding Pinagel pay $1,400 for the return of nude photos Pinagel left behind, and for not trumping up charges against Brummitt.

The second incident triggering Pinagel's PTSD symptoms was her rape on the morning of the McDonald's incident. Pinagel was using an outdoor restroom next to the hospital. A man entered, pushed her against the wall, sexually assaulted her and said, "'Get rid of your man or you both are dead in the desert. Got it doctor?'" Pinagel had no doubt the rape was connected with the Faheys. Pinagel did not report the rape.

Pinagel testified the stress of these events and her PTSD symptoms caused her to make the false reports against Brummitt on April 8, 2011.

Pinagel testified that on April 8, 2012 Brummitt did not assault her out of anger. Brummitt and Pinagel were arguing. Brummitt pointed his finger in front of Pinagel's face. Pinagel bit his finger. Brummitt pulled Pinagel's hair and slapped her across the chin with his fingertips to free his finger. Pinagel tried to exit the car as it was moving. Brummitt pulled her back in to prevent her from getting hurt.

Pinagel testified that when she called 911, she was experiencing PTSD symptoms: "things were kind of coming in and out and they were not happening in a linear fashion."

Pinagel testified that on April 12, 2011, Brummitt woke her up at 9:30 p.m. Pinagel told him to let her sleep for two hours. Brummitt woke Pinagel up 10 minutes before 11:30 p.m. Pinagel was irritated. She asked Brummitt if they could go for a ride to talk and have oral sex. As they were gathering things for the ride Pinagel grabbed the bayonet and put it to her nose. Pinagel said she was "totally overwhelmed." Brummitt told Pinagel not to do something stupid. Pinagel handed Brummitt the bayonet.

Pinagel and Brummitt's pet rat, Lipstick, had a habit of getting into their mattress. After Brummitt recovered the bayonet from Pinagel he thought he saw the bed move. Brummitt began stabbing through the mattress to get the rat. While he was doing this he was saying, "you better not fuck with me," referring to the Faheys. Pinagel did not fear Brummitt would turn the bayonet on her.

Pinagel and Brummitt took turns driving, talking and eating. Pinagel testified she called Geddes to request $20 for gas. Pinagel said she made up the story of the kidnapping to prevent embarrassing information from getting out that might harm her career.

## DISCUSSION

### I. Brummitt's Fifth Amendment right to remain silent was not violated by the prosecutor's comments.

Brummitt claims that the prosecutor's comments in closing argument violated his Fifth Amendment right to remain silent because he asked the jury to interpret Brummitt's failure to make exculpatory statements as evidence of his guilt. Brummitt further argues

6

that defense counsel's failure to object at trial to the prosecutor's statements was ineffective assistance of counsel.

During the prosecutor's summation, he referred to Brummitt's unprompted statements that Pinagel needed rape kits and was sleeping with other men on April 8, and similar statements made April 13, as not the normal behavior of a falsely accused man, and elaborated on what he thought an innocent man would say. There was no defense objection. The statements of April 8 were made after Brummitt was Mirandized. The statements of April 13 were made before Brummitt was in custody.

Brummitt failed to object at trial on the Fifth Amendment ground he now advances and has forfeited it for this appeal. (*People v. Avila* (2009) 46 Cal.4th 680, 710–711.) In any event we disagree with Brummitt that the statements were improperly commented upon, and therefore find there was no ineffective assistance of counsel.

The United States Supreme Court in *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] held that for a prosecutor to comment on a defendant's refusal to testify "cuts down on the privilege by making its assertion costly." (*Id*. at p. 614.) In *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) [96 S.Ct. 2240, 49 L.Ed.2d 91], the Court held that the prosecution may not ask the jury to draw a direct inference from defendant's silence in the face of questioning as being inconsistent with innocence. (*Id*. at p. 635.) A defendant has the right to remain silent in the face of police interrogation. (*Miranda v. Arizona*, *supra*, 384 U.S. at pp. 467–468.) Interrogation is "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted [100 S.Ct. 1682, 64 L.Ed.2d 297].) However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." (*Miranda*, at p. 478.)

Deputy Chavez testified that on April 8, after Brummitt was arrested and given *Miranda* warnings, Brummitt began rambling that Pinagel needed rape kits and was "messing around with different black men." Deputy Chavez asked Brummitt to elaborate

7

on what he meant by rape. Brummitt did not respond in a coherent manner. Deputy Chavez asked Pinagel what Brummitt was talking about. Pinagel said nothing other than that was Brummitt's normal state.

On April 13, as deputies were attempting to arrest him, Brummitt began (without solicitation or prompting from the deputies) "yelling incoherently." Brummitt stated that he was "scared" and "afraid." Brummitt again referenced that his wife had been raped and he had three recordings of sexual assaults on Pinagel. Brummitt also claimed that he was working for the FBI and a local law firm. Throughout the arrest, deputies repeatedly tried to calm Brummitt down, and told him to relax and shut up. The deputies did not interrogate Brummitt or give him *Miranda* warnings while he was making these comments.

Brummitt's statements to deputies on April 8 and 13 were voluntary. The deputies' actions were those normally attendant to arrest and custody. The statements were not made in response to custodial interrogation, but were spontaneously volunteered (and actively discouraged by the deputies), making them admissible. (*People v. Roldan* (2005) 35 Cal.4th 646, 735, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Brummitt relies upon the Ninth Circuit's decision in *Hurd v. Terhune* (2010) 619 F.3d 1080, to support his claim that the prosecutor's comments were a *Doyle* violation. Police arrested Hurd and gave him *Miranda* warnings. Hurd cooperated with police as they investigated the shooting of his wife. Hurd claimed he accidently shot his wife while showing her how to load a gun. When police asked Hurd to reenact the shooting Hurd said, "'I don't want to do that,' 'No,' 'I cant,' and 'I don't want to act it out because that—it's not that clear.'" (*Hurd*, at p. 1089.)

At trial the prosecution commented multiple times in its case in chief and closing argument on Hurd's refusal to reenact the shooting. The Ninth Circuit overturned Hurd's conviction based on these comments. The court found that "Hurd unambiguously invoked his right to silence when officers requested that he reenact the shooting." (*Hurd*

8

*v. Terhune*, *supra*, 619 F.3d at p. 1088.)  As such the prosecutor's comments were a *Doyle* violation.

Unlike the defendant in *Hurd v. Terhune*, *supra*, 619 F.3d 1080, in neither arrest did Brummitt indicate that he did not want to speak to the deputies.  While what he was saying was incoherent, it was nonetheless unprompted and voluntary, and not in response to interrogation by deputies.

*Griffin v. California*, *supra*, 380 U.S. 609 "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Brady* (2010) 50 Cal.4th 547, 566.)  The prosecutor's statements were comments on Brummitt's spontaneous ramblings to police, comparing them to exculpatory statements he could have made.  The prosecution never commented on Brummitt's silence or his lack of testimony.

There are two components to ineffective assistance of counsel:  "counsel's representation fell below objective standards of reasonableness; and . . . there is reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to the defendant would have resulted." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)  As we conclude that there was no prosecutorial misconduct and there was no error in admitting Brummitt's statements, Brummitt has failed to demonstrate that defense counsel was ineffective in failing to object.

## II.     The trial court did not abuse its discretion in denying a mistrial.

Before jury selection, defense counsel and the prosecution agreed there would be no mention of Brummitt's prior record.  During trial, the prosecution played a recording for the jury of Pinagel's 911 call where she briefly mentioned that Brummitt had a record.  Pinagel did not say that Brummitt's prior conviction was for sexual assault.  No objection was made at the time it was played.  The prosecution brought the issue to the court's attention outside the presence of the jury.  Defense counsel moved for a mistrial.

The court denied defense counsel's motion saying:  "I kept it out, out of an abundance of caution.  It still has some probative value.  There is a charge of criminal

9

threats on this. Certainly the victim knowing the defendant's past conduct is relevant as to her state of mind and how seriously she took those threats." Later in the trial defense counsel requested a mistrial on the grounds that Brummitt's Fifth and Fourteenth Amendment rights were violated. The trial judge denied the motion, again saying the past crimes were relevant to the charge of criminal threats.

Brummitt claims that the mention of his record was unduly prejudicial. "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

On the tape Pinagel says Brummitt has "a record." Defense counsel did not object and there is nothing in the trial record to indicate anyone other than the prosecutor noticed. The line was redacted from the transcript given to the jury. The tape sent back to the jury was redacted of Pinagel's statement, and the prosecutor was ordered not to mention it in closing. The trial judge asked defense counsel if she would like a curative instruction given to the jury. Defense counsel said she would rather not have the issue readdressed.

A "fleeting reference" to a criminal record is not "'so outrageous or inherently prejudicial that an admonition could not have cured it.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 123.) Here, defense counsel rejected the trial court's offer for an admonition to the jury.

Brummitt claims that admission of the statement was both irrelevant and unduly prejudicial under California Evidence Code section 352. Only relevant evidence is admissible. (Evid. Code, § 350.) Relevance is defined by statute as, "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'We review the trial court's ruling on the admission of evidence for abuse of discretion.'" (*People v. Homick* (2012) 55 Cal.4th 816, 859.)

10

Section 422 provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, *with the specific intent that the statement . . . is to be taken as a threat,* even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an *immediate prospect of execution* of the threat, and *thereby causes that person reasonably to be in sustained fear for his or her own safety* or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a), italics added.)

The prosecution must establish (1) that the defendant had the specific intent that his statement would be taken as a threat (whether or not he actually intended to carry out the threat) and (2) that the victim was in a state of "sustained fear." The prosecution must additionally show that the nature of the threat, both on "its face and under the circumstances in which it is made," was such that the victim reasonably believed that the threat would be immediately carried out.

The fact that Pinagel knew Brummitt had a criminal record is relevant and probative to establishing these elements. It tends to show Brummitt had specific intent to threaten Pinagel when he held the bayonet up to her nose and said not to "F" with him, and later said someone was going to die. It also shows that Pinagel's fear that the threats would be carried out immediately was reasonable.

Brummitt claims the trial court failed to weigh the undue risk of prejudice to him by admitting his record. The decision to admit a defendant's criminal past must be "scrutinized with great care." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) "[T]he record must demonstrate affirmatively that the trial court did in fact weigh prejudice against probative value." (*People v. Crittenden* (1994) 9 Cal.4th 83, 135.) The record indicates the trial court weighed the mention of Brummitt's record two different times in response to defense counsel's motions for mistrial. Both times the trial court

11

reasoned that Brummitt's record was probative to show Pinagel's state of mind and how seriously she took those threats.

Next Brummitt claims that the court's error was prejudicial under the federal constitutional standard of *Chapman v California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]: "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman* does not apply here, as we find no constitutional error in the trial court's decision regarding Brummitt's record. The court's reasoning in allowing mention of Brummitt's record was a routine balancing between the elements of Penal Code section 422 and the requirements of California Evidence Code section 352. "'"[T]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.]"'" (*People v Taylor* (2010) 48 Cal.4th 574, 650.)

Brummitt further contends that he was prejudiced by the investigating detective's testimony that "[p]rior to my contacting [Pinagel] I had looked up past calls for service regarding her and her husband." Brummitt argues this testimony falsely implied previous domestic violence calls. Defense counsel did not object. The testimony was vague and unresponsive to the question asked. The detective was merely explaining a step in his investigation and never said whether or not there were prior calls. We see no abuse of discretion in the trial court's denial of Brummitt's motions for mistrial.

### III.    The trial court did not violate Brummitt's right to a fair trial.

Brummitt claims that the trial court erred in not enforcing its own order that the Sheriff's Department allow Brummitt to shave before being presented to the jury. Brummitt argues that this was a violation of his Fourteenth Amendment and California Constitution, article I rights to a fair trial.

The day before voir dire the trial court issued an order to the Los Angeles County Sheriff's Department to allow the defendant to groom himself. The order was faxed the same day. The next day defense counsel informed the trial court that the sheriff's department had not complied with the order. Defense counsel requested that Brummitt

12

be allowed to groom himself before being presented to the jury. The court denied the request: "[H]e doesn't look unkempt. The facial hair is trimmed. It's short. It looks like a regular beard." Defense counsel did not object.

Brummitt's facial hair raises no constitutional issues. The trial court noted the fact that Brummitt did not appear unkempt. "[T]he court's conclusion that there was 'nothing unkempt' about the defendant's appearance will not be disturbed absent convincing evidence to the contrary." (*People v. Sanchez* (1969) 275 Cal.App.2d 226, 232.) In *United States v. Anderson* (9th Cir. 1977) 561 F.2d 1301, defendant "was attired in non-prison clothes. His hair was no longer than that of Government counsel and defense counsel. And there was no request for a mistrial or a cautionary instruction on the clothes, hair." (*Anderson*, at p. 1303.) Under these circumstances the Ninth Circuit held the defendant's constitutional claim had "no merit." (*Ibid.*)

Brummitt points to a juror who had to be removed during the voir dire process as evidence that his facial hair prejudiced him in front of the jury. At a sidebar the juror was crying and raised concerns about running into Brummitt if he was released. The trial judge dismissed the juror for cause. The juror did not say it was Brummitt's appearance that caused her concern. At that point in the trial, Brummitt had already been admonished twice outside the jury's presence, and the court had ordered extra deputies in the courtroom, based on Brummitt's outbursts. Brummitt has presented no compelling evidence that the failure to shave his facial hair violated his right to a fair trial.

## IV. The placement of two deputies in the courtroom did not deny Brummitt the presumption of innocence.

Brummitt next claims that the positioning of two extra deputies in the courtroom denied him his presumption of innocence.

During voir dire, the trial court "noted some behavior that is of concern." The trial judge said, "At one point I had my finger on the panic button because I thought [Brummitt] was going to attack my bailiff." The court gave Brummitt the option of wearing a "stealth belt" or having extra deputies positioned in the courtroom, one behind

the defendant. Defense counsel objected to both and was overruled. Brummitt chose to accept extra deputies.

Decisions regarding security measures in the courtroom are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 632.) "[T]he stationing of a courtroom deputy next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need." (*Id*. at p. 629.) However, the decision may not be deferred to law enforcement. The trial court must exercise its own discretion and determine on a case-by-case basis whether such heightened security is appropriate. (*Id*. at p. 642.)

In this case, Brummitt never testified. A deputy was placed behind him as he sat at the defense table. Contrary to the defendant in *People v. Stevens*, *supra*, 47 Cal.4th 625, who did testify, Brummitt did not testify with a deputy next to him on the witness stand. The presence of a deputy in close proximity to Brummitt is therefore even less inherently prejudicial.

The trial judge had his own concerns for the security of the courtroom as evidenced by the fact that he had his hand on the "panic button" at one point. The trial judge noticed a "level of hostility" and agitation, and also noticed that Brummitt "makes gestures like putting a noose around his neck and pulling it taut in front of the jury." While staff members indicated concerns to the judge for the courtroom's safety, the record reflects that the decision was entirely the trial judge's, not law enforcement's.

## V.     The trial court did not abuse its discretion in excluding Pinagel's medical records and bank statements.

Brummitt claims the trial court's exclusion of Pinagel's medical billing records and bank statements was unreasonable and violated his Sixth and Fourteenth Amendment right to present a complete defense.

Defense counsel sought to introduce medical billing records that showed Pinagel was diagnosed with PTSD in 2001 to 2004. Brummitt also sought to introduce Pinagel's

banking records with a withdrawal statement claiming they were to pay off the Faheys. Brummitt contends both were necessary to support his defense.

The trial court did not allow Brummitt to present Pinagel's medical billing records. The court said the defense presented no evidence that PTSD is a continuing condition that would persist for at least seven years, from Pinagel's 2001-2004 diagnosis until April 8 or 13, 2011, the dates of the events in issue at trial.

The court denied Brummitt's request that Pinagel's bank statements be admitted. The trial judge agreed that some of what happened with the Faheys was relevant, but that whether Pinagel paid extortion to the Faheys was "a whole different trial at this point," and irrelevant.

Both records were hearsay. "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Brummitt advanced the medical billing records to prove Pinagel suffered from PTSD. Her banking records were advanced to prove she paid the Faheys extortion.

The medical billing records and bank statements are not part of the record on appeal. Thus the record does not establish a foundation for introduction of records under the business records exception to the hearsay rule. Evidence Code section 1271 provides as follows: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." The record shows Brummitt did not attempt to meet these requirements when he attempted to introduce the banking and medical billing records.

15

An appellate court applies the abuse of discretion standard of review to any trial court ruling on Evidence Code section 352. (*People v Jablonski* (2006) 37 Cal.4th 774, 805.)

Pinagel's medical billing records were properly excluded. Brummitt offered no evidence that PTSD was a continuing condition other than defense counsel's bare assurances that the "DSM-4" indicated that PTSD "doesn't go away" and Pinagel's testimony that "[y]ou don't get over" PTSD, and "there is no cure." The trial court said, "I don't have any evidence before me that [PTSD] would continue on into 2011."

In this instance the trial court did not abuse its discretion. Barring a substantial showing that PTSD is an ongoing condition, Pinagel's medical billing records from 2004 have no bearing on her behavior in 2011. "'The inference which defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence.'" (*People v. Babbitt* (1988) 45 Cal.3d 660, 682.)

The same reasoning applies to Pinagel's bank records. Brummitt sought to introduce records of a cash withdrawal of $2,500 from Pinagel's bank account. Brummitt wanted to use these records as corroboration that the Faheys were extorting Pinagel for $1,400. A generic statement of a cash withdrawal gives no indication what the money is used for. The amount of the withdrawal was $1,100 more than Pinagel claimed the Faheys were asking. To introduce the records would call on the jury to make a speculative inference, and the evidence was therefore irrelevant.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

MALLANO, P. J.

CHANEY, J.